350 Conn. 557    NOVEMBER, 2024    557

Idlibi *v.* Hartford Courant Co.

# AMMAR IDLIBI *v.* HARTFORD COURANT COMPANY
## (SC 20800)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Dannehy and Westbrook, Js.

*Syllabus*

The self-represented plaintiff, who had sought to recover damages from the
defendant newspaper in connection with its publication of two articles that
allegedly defamed the plaintiff, appealed from the judgment of the Appellate
Court, which had affirmed the trial court's judgment. In granting the defen-
dant's motion for summary judgment, the trial court had concluded, inter
alia, that five allegedly defamatory statements in the articles were substan-
tially true or were subject to the fair report privilege and, therefore, were
protected speech under the first amendment to the United States constitu-
tion. On appeal to this court, the plaintiff claimed, inter alia, that the Appel-
late Court had improperly declined to consider his claim that the trial court
should have permitted him to proceed on a sixth allegation, which was only
vaguely alluded to in his pleadings, that a misleading stock photograph
accompanying the two articles was itself independently defamatory. *Held*:

Regardless of whether the Appellate Court properly declined to review the
plaintiff's claim regarding the stock photograph, the trial court did not err
in declining to treat the plaintiff's passing references to that photograph as
an independent allegation of defamation in granting the defendant's motion
for summary judgment.

The plaintiff had contended only that the stock photograph amplified his
other defamation claims and that it was evidence of actual malice, and he
did not allege in his complaint that the photograph was independently
defamatory or otherwise identify the photograph as defamatory before the
trial court, and, under the circumstances of this case, the plaintiff's self-
represented status did not relieve him of the obligation to sufficiently articu-
late a claim that the stock photograph was independently defematory.

Moreover, if the trial court had sua sponte assisted the plaintiff in articulating
and pleading an additional claim that was not apparent on the face of his
complaint, and of which the defendant was unaware, the court would have
risked creating an appearance of partiality and would have interefered with
the defendant's rights, and, even if the plaintiff had been permited to proceed,
he would have faced difficulties in prevailing on that additional claim.

For the fair report privilege defense to defamation to apply to an allegedly
defamatory report concerning an official proceeding, a defendant need only
establish that it has provided a fair and substantially accurate account of

Idlibi *v.* Hartford Courant Co.

the proceeding, and demonstrating that the defendant acted with malice in fact does not defeat the privilege.

(*Two justices dissenting in one opinion*)

Argued December 19, 2023—officially released August 27, 2024*

*Procedural History*

Action to recover damages for, inter alia, defamation, and for other relief, brought to the Superior Court in the judicial district of New Britain, where the court, *Farley, J.*, granted the defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed to the Appellate Court, *Cradle*, *Suarez* and *Seeley*, *Js*., which affirmed the trial court's judgment, and the plaintiff, on the granting of certification, appealed to this court. *Affirmed.*

*Ammar A. Idlibi*, self-represented, the appellant (plaintiff).

*William S. Fish, Jr.*, with whom was *Alexa T. Millinger*, for the appellee (defendant).

*Opinion*

McDONALD, J. The self-represented plaintiff, Ammar Idlibi, a pediatric dentist, appeals from the judgment of the Appellate Court affirming the judgment of the trial court, which rendered summary judgment in favor of the defendant, Hartford Courant Company, on his defamation claims. The plaintiff's complaint centers around two articles published by the defendant that allegedly exaggerated the scope and seriousness of disciplinary proceedings conducted by the Department of Public Health (department) and the Connecticut State Dental Commission that resulted in a reprimand, fines, and probation of the plaintiff's license to practice as a dentist. The courts below concluded that the five allegedly defamatory statements contained in the articles either were

* August 27, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Idlibi *v.* Hartford Courant Co.

substantially true or were subject to the fair report privilege and, therefore, were protected speech under the first amendment to the United States constitution. In this certified appeal, the plaintiff's primary claim is that he should have been permitted to proceed to trial on a sixth allegation, one only vaguely alluded to in his pleadings, that a stock (or file) photograph accompanying the defendant's articles also was defamatory. Although this case raises important questions about the extent to which the judiciary must accommodate the inexperience of self-represented litigants, and potentially implicates some constitutional questions of first impression that the parties have not fully briefed, we ultimately conclude that this sixth claim is not properly in the case and, therefore, affirm the judgment of the Appellate Court.

I

The relevant facts and procedural history are set forth in the decision of the Appellate Court. See *Idlibi* v. *Hartford Courant Co.*, 216 Conn. App. 851, 854–60, 287 A.3d 177 (2022). They may be summarized as follows.

Between 2013 and 2018, the plaintiff was the subject of two unrelated sets of disciplinary proceedings, both of which resulted in findings of professional misconduct. The first arose from allegations that, between 2010 and 2012, he had prescribed Valium, Xanax, codeine, and other controlled substances to himself and his family members outside the scope of dentistry. Those proceedings terminated when the plaintiff signed a consent order, admitting to certain of the allegations and agreeing to pay a $2000 civil penalty.

The second set of proceedings arose from an April 26, 2016 dental procedure in which the plaintiff, filling in for an associate, put a three year old patient under general anesthesia and placed crowns on eight of her teeth, even though her mother had given informed con-

Idlibi *v.* Hartford Courant Co.

sent for the placement of only one crown. At the time, the defendant was investigating a form of Medicaid fraud in which, to circumvent Medicaid's prior approval requirements, pediatric dentists would take advantage of a limited exception that allows them to perform unapproved procedures if the need therefor is discovered while a patient is under general anesthesia.

The patient's mother complained to the department, which conducted an investigation and ultimately brought charges against the plaintiff before the dental commission. A panel of commission members conducted hearings on the matter and drafted a proposed decision that was to be the subject of a hearing before the full commission on September 5, 2018. The proposed decision concluded that the plaintiff had, among other things, failed to obtain adequate informed consent for the procedure, failed to adequately chart the findings that led him to conclude that the crowns were necessary, failed to first attempt treatment by less invasive means, and placed one or more crowns without adequately documented justification.[1]

One week before the scheduled hearing, Matthew Ormseth, a reporter for the defendant, conducted an interview with the plaintiff. The stated purpose of the interview was to discuss the allegations surrounding the April 26, 2016 dental procedure, as well as another department investigation into allegations that Smile by

_____

[1] Following the September 5, 2018, hearing, the full dental commission found the plaintiff's testimony not to be credible and credited the testimony of the department expert that the plaintiff should not have crowned several of the patient's teeth because the enamel was completely healthy and the X ray did not show any decay. The dental commission agreed with most of the proposed draft findings and ordered various sanctions against the plaintiff, including a $10,000 civil penalty, placement of a reprimand on his license to practice as a dentist, and a three year probationary period, during which his license would be subject to conditions. A series of appeals and remands ensued, which ultimately resulted in changes to some of the commission's findings and conclusions but imposition of the same sanctions for the plaintiff's professional misconduct.

Idlibi *v.* Hartford Courant Co.

Design, a dental practice co-owned by the plaintiff, had engaged in similar misconduct.[2] On September 5, 2018, the defendant published two articles authored by Ormseth, one the morning before the dental commission hearing and one following the hearing. The articles, although including substantially accurate accounts of the commission proceedings, contained five allegedly false or misleading statements regarding the plaintiff: (1) a headline stating, "State Probes Terryville Dentist for Excessive Work on *Children's* Teeth," when, in fact, only one child's set of teeth was implicated; (2) a statement that the state had been *investigating* the plaintiff for two years, when, in fact, the investigation and related proceedings together had spanned two years; (3) a statement that his work had been found to be *medically* unsound, when, in fact, it was *dentally* unsound; (4) a statement about the plaintiff's first set of disciplinary proceedings that allegedly created the false impression that he abused narcotic drugs; and (5) a statement that, in the past fiscal year in Connecticut, only thirty-seven steel crowns had been placed on the teeth of children insured by Medicaid while under general anesthesia, which allegedly gave the false or misleading impression that the plaintiff was singlehandedly responsible for more than one fifth of such placements. (Emphasis added.)

Both articles were accompanied by a photograph that depicts unidentified, gloved hands performing a dental procedure on an unidentified patient. The photograph shows a bent metal tube or implement entering the patient's mouth between the bottom teeth and gumline. It also shows four thin, flatheaded, metal pins, approximately two to three finger widths in length, that the dentist appears to be inserting in front of or between the

_____

[2] The parties dispute to what extent Ormseth represented that the interview and the ensuing stories were to encompass the dental commission's proceedings regarding the plaintiff in addition to the Smile by Design allegations.

Idlibi *v.* Hartford Courant Co.

patient's bottom teeth. The caption to the photograph in the first article provides: "A Terryville dentist, Ammar Idlibi, is being investigated by the state Department of Public Health for doing unnecessary and medically unsound work on children." The photograph credit provides: "(Travis Heying / Associated Press)." The caption to the photograph in the second article, which contains no photograph credit, provides: "State Probes Terryville Dentist for Excessive Work on Children's Teeth." The reference to the Associated Press in the photograph credit of the first story is the only suggestion in either article that the photograph is a stock image and not a photograph of the plaintiff or the procedure at issue in the dental commission proceedings.

The plaintiff, proceeding as a self-represented party, commenced this action by way of a four count complaint, alleging defamation by libel, misrepresentation, negligent infliction of emotional distress, and gross negligence. In the defamation count, which is the only one at issue in the present appeal, the plaintiff alleged that the five previously discussed statements were false and/ or misleading and that the defendant published them in bad faith, with improper motive, and with actual knowledge of their falsity.

The only references in the complaint to the photograph are in paragraphs 7 and 12 of the "general allegations," prior to count 1. Paragraph 7 alleges in relevant part: "Under the publication headline, the defendant published a picture of a child who appears to be undergoing an invasive surgical procedure with long screw-like dental implants. The graphic picture was  .  .  . intended to incite public anger against the plaintiff. Under that graphic picture, the defendant identified the plaintiff by name  .  .  .  ." Paragraph 12 alleges: "In its second publication, the defendant published the same graphic picture of the child undergoing the invasive surgical procedure with long screw-like dental implants."

350 Conn. 557 NOVEMBER, 2024 563

Idlibi *v.* Hartford Courant Co.

In its answer to paragraph 7, the defendant denied that the article was defamatory or that it contained any false statements or representations. With respect to the photograph, the defendant admitted that the article was accompanied by a photograph but "denie[d] that the photograph accompanying the article was 'intended to incite public anger against the plaintiff.' " With respect to paragraph 12, the defendant "admit[ted] that it published a photograph, which speaks for itself, accompanying the [second] article" and otherwise left the plaintiff to his proof. The defendant's first special defense asserted that it had "relied on and accurately characterized public information in writing the articles . . . and, therefore, the claims are barred by the fair report doctrine." The defendant then moved for summary judgment, contending that all four counts of the complaint alleged that the defendant made five libelous statements in the two articles and that all of the alleged statements were based directly on reports by state agencies or state officials and are thus constitutionally protected speech.

The plaintiff submitted an affidavit in opposition to the defendant's motion for summary judgment and later, with the court's permission, a supplemental affidavit. Neither affidavit mentioned the photograph. As an attachment to the supplemental affidavit, the plaintiff submitted an email chain between Ormseth and Rick Green, the defendant's content director. One email from Ormseth, bearing the subject line "RE: what i cut," provides: "I put in a file photo of generic dental work . . . ." This is the only evidentiary reference to the fact that the photograph does not depict the plaintiff or the procedure at issue in the articles.

The plaintiff did make several references to the photograph in his legal arguments to the court. In each instance, though, the argument was framed in terms of how the photograph exemplified the defendant's alleged "malice" and nefarious intent, not as an independent legal

Idlibi *v.* Hartford Courant Co.

defamation claim. During the hearing on the motion for summary judgment, the plaintiff argued as follows, in his capacity as a self-represented party: "Nobody [has] addressed the graphic picture that you've seen, Your Honor . . . with all those long, big screws sticking out of the child's mouth. Nobody [has] addressed that. Counsel didn't mention anything about that. Why would somebody publish such a big, graphic picture of this child with . . . screws [sticking] out of his mouth? What's the point? That's not even related to a crown. Those are not crowns. . . . I'm a board-certified pediatric dentist. We don't even do this on children, with these kind[s] of implements sticking out of the mouth of a child . . . . I've never done this before. It's unheard of. I don't know where [the defendant] got this picture from, but this was obviously, intentionally made with ill intention and bad faith."

The plaintiff also raised the issue of the photograph in his surreply in opposition to summary judgment. On four separate occasions in the surreply, the plaintiff emphasized (at times using all caps or underscoring) that five allegedly defamatory statements—the same five we previously enumerated—were at issue in the case. He then methodically discussed the five statements, each in a separately titled section of his surreply. His only references to the photograph, which he characterized as "unrelated," were in a later section of the surreply, in which he argued that the defendant's actions were taken with "actual malice."

The trial court found in favor of the defendant and granted its motion for summary judgment on all of the plaintiff's claims. With respect to the defamation claims, the trial court concluded that the five allegedly defamatory statements were protected first amendment speech under either the fair report privilege or the substantial truth doctrine. The court's memorandum of decision made no mention of the photograph.

350 Conn. 557 NOVEMBER, 2024 565

Idlibi *v.* Hartford Courant Co.

The plaintiff subsequently filed a motion for articulation. He sought articulation of seven aspects of the trial court's memorandum of decision. The motion did not ask the trial court to address—indeed, it did not even mention—the photograph.

The plaintiff did reference the photograph in a subsequent motion to reargue, in which he referred to it as "misleading," "false," and "unrelated"; in a motion for further articulation, in which he referred to the photograph as "irrelevant" and "unrelated"; and in a related motion for review. In the motion to reargue, he contended that the photograph "amplifie[d] the defamatory effect" of the article's headline. The motion for further articulation referenced his "claims of malice unrelated to the truthfulness of the published defamatory statements (such as the graphic pictures published to incite public anger against the plaintiff) . . . ." In the motion for review, the plaintiff again referenced his "claims of actual malice in publishing unrelated graphic pictures" and claims of "malicious acts not related to [the] reporting [of] any proceeding," such as "publishing an unrelated graphic picture . . . ."

The plaintiff appealed to the Appellate Court, contesting, among other things, the trial court's determination that the fair report privilege provided grounds for rendering judgment for the defendant on his defamation claims. See *Idlibi* v. *Hartford Courant Co.*, supra, 216 Conn. App. 860. The plaintiff also contended that the photograph itself constituted an abuse of the fair report privilege because it was misleading and unrelated to the proceedings. Id., 862 n.11. Affirming the judgment, the Appellate Court declined to consider the photograph claim, stating that it had not been distinctly raised before or decided by the trial court. Id., 862 n.11, 869.

We granted certification to appeal, limited to the following two questions: (1) "Did the Appellate Court cor-

Idlibi *v.* Hartford Courant Co.

rectly determine that it was not required on appeal to consider the self-represented plaintiff's argument that the trial court should have denied the defendant's motion for summary judgment, in whole or in part, because the allegedly defamatory newspaper articles at issue included a misleading image depicting a dental procedure unrelated to the administrative proceeding against the plaintiff that was the subject of the articles?'' And (2) ''[i]f the answer to the first question is 'yes,' did the Appellate Court properly uphold the trial court's decision granting summary judgment for the defendant with respect to the plaintiff's defamation claims?''[3]

[3] The parties' briefing before this court primarily addresses the first certified question and has given us no cause to gainsay the Appellate Court's resolution of the plaintiff's other defamation claims. Accordingly, we confine our discussion to the issue of the photograph, which that court considered only fleetingly in a footnote. See *Idlibi* v. *Hartford Courant Co.*, supra, 216 Conn. App. 862 n.11; see, e.g., *State* v. *Butler*, 348 Conn. 51, 55, 300 A.3d 1145 (2023) (declining to address second certified question). In the interest of completeness, however, we briefly explain why the plaintiff's two main arguments as to the second certified question are unpersuasive.

The plaintiff's primary argument as to the second certified question is that three cases from other jurisdictions, the most recent one published almost four decades ago, take the view—contrary to the decision of the Appellate Court—that a headline can be facially defamatory, regardless of the content of the accompanying article, because the public frequently reads only the headline. Those cases are readily distinguishable, however, and the most recent one acknowledges that the majority rule is that a newspaper headline must be construed in connection with the associated article for purposes of assessing defamation. See *Burgess* v. *Reformer Publishing Corp.*, 146 Vt. 612, 620, 508 A.2d 1359 (1986). We do not foreclose the possibility that, in an extreme case, such as a headline accusing an innocent person of having committed a crime, the headline alone might be libelous, even if the truth were clarified in the accompanying article. But this is not such a case. The plaintiff does not contend that he was innocent of the charged conduct, only that the headline could have given readers the misleading impression that he mistreated more than one child. And, in fact, an initial version of the article alleged that the plaintiff owned another dental practice that had engaged in similar misconduct with respect to a second child.

The plaintiff's other principal argument with respect to the second certified question is that the Appellate Court considered the various defamatory statements in isolation, rather than in context and as a whole. Setting aside the tension between this argument and the prior one, we agree with the Appellate Court that the articles, read in their entirety, fairly summarized

Idlibi *v.* Hartford Courant Co.

*Idlibi* v. *Hartford Courant Co*., 346 Conn. 908, 908–909, 288 A.3d 1031 (2023). Additional facts will be set forth as necessary.

II

Had the plaintiff been represented by counsel, there would be little doubt that the Appellate Court properly declined to review the claim that the photograph was independently defamatory.[4] To merit consideration, "an issue must be distinctly raised before the trial court, not just briefly suggested . . . . The requirement that [a] claim be raised distinctly . . . means that it must be so stated as to bring to the attention of the court the *precise* matter on which its decision is being asked."[5] (Citations omitted; emphasis in original; internal quotation marks omitted.) *Cenatiempo* v. *Bank of America, N.A.*, 333 Conn. 769, 815–16, 219 A.3d 767 (2019). See

the charges and proceedings before the dental commission. See *Idlibi* v. *Hartford Courant Co.*, supra, 216 Conn. App. 861–66. Even taken together, the handful of alleged misrepresentations—saying "medical" instead of "dental," referring to a two year "investigation" rather than a two year "proceeding," saying "children's" rather than "child's"—at best only slightly exaggerated the core truth of the report, which is that the plaintiff twice has been subjected to discipline for his professional misconduct. See, e.g., *Strada* v. *Connecticut Newspapers, Inc.*, 193 Conn. 313, 322, 477 A.2d 1005 (1984) ("[when] the main charge, or gist, of the [article] is true, minor errors that do not change a reader's perception of the statement do not make the statement actionable" (internal quotation marks omitted)).

[4] We proceed on the assumption that the gravamen of the plaintiff's argument on appeal is that his complaint "functionally raised" the claim that the photograph was independently defamatory and that it was not protected by the fair report privilege because it was unrelated to the proceedings before the dental commission. At times, however, he seems to be making a different argument, namely, that the photograph was evidence of the defendant's malicious intent toward him and that such malicious intent vitiates the fair report privilege as to the five allegedly defamatory statements contained in the articles. To the extent that the plaintiff also makes this claim, which appears to have been his argument before the trial court, we address it in part II C of this opinion.

[5] Although the plaintiff is correct that, at the summary judgment stage, the defendant bears the burden of establishing that summary judgment is appropriate as to every pleaded claim, the defendant, like the trial court, need only address those claims that have been distinctly raised.

Idlibi *v.* Hartford Courant Co.

generally *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 619–31, 99 A.3d 1079 (2014).

In this case, the complaint never alleges that the photograph is independently defamatory. Nor do the plaintiff's affidavits so allege. Indeed, although the plaintiff refers in his briefing to his allegation that the defendant "published a defamatory, misleading cover image," the record does not reveal a single occasion on which he identified the photograph as defamatory before the trial court.

At the time the trial court issued its memorandum of decision, the only possible suggestion that the photograph did not depict the plaintiff and that it might mislead readers as to the nature of the procedure was his statement to the court during the hearing on the motion for summary judgment. But that statement did not identify the photograph as defamatory, and, in any event, the arguments of counsel or a self-represented party do not constitute admissible evidence for purposes of summary judgment. See, e.g., *White* v. *Mazda Motor of America, Inc.*, supra, 313 Conn. 632; *Rockwell* v. *Quintner*, 96 Conn. App. 221, 233–34 n.10, 899 A.2d 738, cert. denied, 280 Conn. 917, 908 A.2d 538 (2006); *Ferri* v. *Powell-Ferri*, Docket No. X03-HHD-CV-16-6066432-S, 2018 WL 4441150, *8 n.8 (Conn. Super. August 23, 2018), aff'd, 200 Conn. App. 63, 239 A.3d 1216, cert. denied, 335 Conn. 970, 240 A.3d 285 (2020); see also *Doe* v. *West Hartford*, 328 Conn. 172, 190 n.12, 177 A.3d 1128 (2018) ("[i]t is well established under our law that the evidence submitted in . . . opposition to . . . summary judgment must be admissible evidence"); *Berman* v. *Berman*, 203 Conn. App. 300, 306–309, 248 A.3d 49 (2021) (holding that trial court erred in considering as evidence statements made by self-represented defendant when she was acting as counsel during hearing).

Similarly, in his subsequent briefing to the trial court, the plaintiff contended only that the photograph ampli-

Idlibi *v.* Hartford Courant Co.

fied his other defamation claims and was evidence of "actual malice," not that it was independently defamatory. And those arguments, too, included no admissible evidence, other than the one line email that the plaintiff never addressed, which vaguely references a generic file photograph. Had the plaintiff been represented by counsel, none of that would have warranted a denial of summary judgment with respect to an independent defamation claim as to the photograph. See *White* v. *Mazda Motor of America, Inc.*, supra, 313 Conn. 619–31. The issue before us, then, comes down to the degree of leeway we afford to self-represented parties who fail to comply with established pleading requirements.

A

The following well established principles guide our review.[6] Although a party "has every right" to act as his own advocate; *Cersosimo* v. *Cersosimo*, 188 Conn. 385, 394, 449 A.2d 1026 (1982); when he elects to do so, "he takes the risk that because of his inexperience and lack of knowledge, he will suffer disadvantages to which, with proper representation, he would not be subject." *State* v. *Lo Sacco*, 12 Conn. App. 481, 496, 531 A.2d 184, cert. denied, 205 Conn. 814, 533 A.2d 568 (1987). In determining the lengths to which our courts may and should go to mitigate those disadvantages, we have sought to strike a balance.

On the one hand, we have emphasized that "it is the established policy of the Connecticut courts to be solicitous of [self-represented] litigants and . . . to construe the rules of practice liberally in [their] favor . . . . The courts adhere to this rule to ensure that [self-represented] litigants receive a full and fair opportunity to be heard, regardless of their lack of legal edu-

---

[6] See *NetScout Systems, Inc.* v. *Gartner, Inc.*, 334 Conn. 396, 408–11, 223 A.3d 37 (2020) (setting forth standard of review on summary judgment and background free speech principles).

Idlibi *v.* Hartford Courant Co.

cation and experience . . . .'' (Internal quotation marks omitted.) *Traylor* v. *State*, 332 Conn. 789, 806, 213 A.3d 467 (2019).

On the other hand, we have cautioned that, ''[a]lthough we allow [self-represented] litigants some latitude, the right of self-representation provides no attendant license not to comply with relevant rules of procedural and substantive law.'' (Internal quotation marks omitted.) Id.; see also *Basilicato* v. *Dept. of Public Utility Control*, 197 Conn. 320, 324, 497 A.2d 48 (1985) (''[a]ny litigant may choose to proceed without representation, but all are bound by the same standards''); *Berman* v. *Berman*, supra, 203 Conn. App. 312 (''[s]elf-represented parties are not afforded a lesser standard of compliance'' (internal quotation marks omitted)); *Patrowicz* v. *Peloquin*, 190 Conn. App. 124, 136 n.13, 209 A.3d 1233 (self-represented parties ''are bound by the same rules of evidence and procedure as those qualified to practice law'' (internal quotation marks omitted)), cert. denied, 333 Conn. 915, 216 A.3d 651 (2019). For example, a self-represented litigant is not ''relieved of the obligation to sufficiently articulate a claim so that it is recognizable to a reviewing court . . . .'' (Internal quotation marks omitted.) *Burton* v. *Dept. of Environmental Protection*, 337 Conn. 781, 804, 256 A.3d 655 (2021); see also *Traylor* v. *State*, supra, 332 Conn. 806 (''[a] court does not have the discretion to look beyond the pleadings and trial evidence to decide claims not raised'' (internal quotation marks omitted)).

In particular, special allowances should not be made for a self-represented party when to do so would (1) interfere with the rights of other parties; see, e.g., *Traylor* v. *State*, supra, 332 Conn. 806; (2) violate the rules of evidence or procedure; see, e.g., *Cersosimo* v. *Cersosimo*, supra, 188 Conn. 394; or (3) undermine the perceived neutrality of the judicial officer and place the

Idlibi *v.* Hartford Courant Co.

court in the role of advocate. See, e.g., *Pliler* v. *Ford*, 542 U.S. 225, 231, 124 S. Ct. 2441, 159 L. Ed. 2d 338 (2004).

B

We must determine on which side of the scale the present case falls. For the following four reasons, we conclude that, regardless of whether the Appellate Court properly declined to review the claim, the trial court did not err in granting the defendant's motion for summary judgment without treating the plaintiff's passing references to the photograph as an independent allegation of defamation.

First, we conclude that this case is more akin to those in which we have held a claim of a self-represented party not to be distinctly raised. In cases involving ill-defined pleadings by self-represented parties, our courts have construed those pleadings broadly and deemed the claims to be sufficiently pleaded when they were specific enough to reasonably alert the trial court and the defendant as to the nature of the claim. See, e.g., *Henderson* v. *Commissioner of Correction*, 181 Conn. App. 778, 793–94, 189 A.3d 135 (although application for fee waiver was not "a model of clarity" and reviewability of grounds for appeal identified therein was "debatable," court concluded that accompanying motion sufficiently alerted court as to nature of claims at issue), cert. denied, 329 Conn. 911, 186 A.3d 707 (2018); *Hill* v. *Williams*, 74 Conn. App. 654, 658–62, 813 A.2d 130 (although claims were not "artfully pleaded," preamble to complaint expressly identified breach of contract claim), cert. denied, 263 Conn. 918, 822 A.2d 242, and cert. denied, 263 Conn. 918, 822 A.2d 242 (2003).

By contrast, we have concluded that claims were not preserved when the complaint made only a vague or passing reference thereto. See, e.g., *Oliphant* v. *Commissioner of Correction*, 274 Conn. 563, 570–71, 877 A.2d 761 (2005) (declining to construe self-represented par-

Idlibi *v.* Hartford Courant Co.

ty's "indirect and passing reference" as distinct pleading, "even under a broad and liberal reading," because "courts . . . cannot contort pleadings in such a way so as to strain the bounds of rational comprehension" (internal quotation marks omitted)); *New Haven* v. *Bonner*, 272 Conn. 489, 497–99, 863 A.2d 680 (2005) (brief references to underlying facts during hearings were insufficient to preserve claim when self-represented defendant never identified it as potential due process violation); *Mourning* v. *Commissioner of Correction*, 120 Conn. App. 612, 623, 992 A.2d 1169 ("passing reference" was insufficient to raise claim, even under liberal reading of complaint), cert. denied, 297 Conn. 919, 996 A.2d 1192 (2010); see also *Basilicato* v. *Dept. of Public Utility Control*, supra, 197 Conn. 324–26 (clerk was not required to inform self-represented plaintiff that notice was improperly filed); *Overley* v. *Overley*, 209 Conn. App. 504, 512, 268 A.3d 691 (2021) ("[w]e will not promote a Kafkaesque academic test by which [a trial court] may be determined on appeal to have failed because of questions never asked of [it] or issues never clearly presented to [it]" (internal quotation marks omitted)), cert. denied, 343 Conn. 901, 272 A.3d 657 (2022).

"[A]t some point in a lawsuit even [self-represented] litigants must make clear to the court their claims and the facts that they believe entitle them to specific relief. The summary judgment stage is an appropriate juncture to identify the real issues in a case." *Salahuddin* v. *Coughlin*, 781 F.2d 24, 29 (2d Cir. 1986). As we explained in *Markley* v. *Dept. of Public Utility Control*, 301 Conn. 56, 23 A.3d 668 (2011), "[t]he principle that a plaintiff may rely only [on] what he has alleged is basic. . . . In order to administer justice fairly, this court cannot allow [self-represented] litigants . . . to try on new claims throughout the appellate process in the hope of finding one that fits." (Citations omitted; internal quotation marks omitted.) Id., 75.

Idlibi *v.* Hartford Courant Co.

The present case falls on the latter side of this divide. We have explained that "[e]ach [defamatory] statement furnishes a separate cause of action and requires proof of each of the elements for defamation." *Gleason* v. *Smolinski*, 319 Conn. 394, 431, 125 A.3d 920 (2015). Those elements are a (1) false (2) communication (3) that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.[7] Id. There is no serious question that the photograph was a communication, and the allegation in the complaint that "[t]he graphic picture was . . . intended to incite public anger against the plaintiff" plausibly could be construed to allege the third element of reputational harm. There is no suggestion in the complaint or the plaintiff's affidavits, however, that the photograph was intended to or did present a false depiction of the plaintiff's own dental procedures. Nor is there any suggestion that the plaintiff intended his fleeting references to the photograph to constitute a distinct claim of defamation. We emphasize in this respect that the plaintiff expressly alleged in his complaint that each of the defendant's five allegedly defamatory statements was false, unfair, or inaccurate, and he itemized each alleged defamation in his briefing to the trial court, but he made no mention of the truth, falsehood, or accuracy of the photograph; nor did he ever list it among his discrete defamation claims.[8]

_____

[7] We need not and therefore do not determine whether the plaintiff also was required to establish actual malice; see *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974); *Gleason* v. *Smolinski*, supra, 319 Conn. 432–33 and n.32; and, if so, what knowledge the defendant would need to have had regarding the photograph (e.g., that it was a stock image, that a substantial share of readers would have been confused, etc.) for there to be actual malice.

[8] The plaintiff's only contention in the complaint was that the photograph was calculated to incite anger against him. Certainly, anger against the plaintiff might be incited by a misleading photograph that portrayed a different dentist than him and a different procedure than the one at issue in the hearing. But an equally plausible interpretation of that allegation—and the one on which both the defendant and the trial court appear to have pro-

Idlibi *v.* Hartford Courant Co.

The sole indication that the plaintiff considered the photograph to be a false depiction of his work came in his arguments to the court, as a self-represented party. But the plaintiff has not identified (and our own research has not revealed) any case in which a Connecticut court has made an exception to the rule that only admissible evidence may be considered in support of or opposition to a motion for summary judgment. Even if we were to construe the complaint in light of the arguments before the trial court, we note that the plaintiff brought up the photograph only in the context of "going back . . . to the malice issue," and his conclusion was that the photograph "was obviously, intentionally made with ill intention and bad faith." The plaintiff also never alleged that the procedure depicted in the photograph was more graphic or disturbing, or reflected worse on his reputation, than what actually occurs when eight crowns are unnecessarily placed on the teeth of a three year old child. Once again, then, any suggestion that the photograph represented an independent defamatory statement was at best a vague and passing reference of the sort that we have deemed insufficient to distinctly raise a claim, even by a self-represented party.

Second, both this court and the Appellate Court routinely decline to consider the claims and to address the arguments of self-represented parties when, due to the absence of professional counsel, those claims and arguments are not presented with sufficient clarity to facilitate a full review. See, e.g., *Burton* v. *Dept.of Environmental Protection*, supra, 337 Conn. 803–805; *Traylor* v. *State*, supra, 332 Conn. 807; *Wells Fargo Bank, National Assn.* v. *Doreus*, 218 Conn. App. 77, 79 n.1, 290 A.3d 921, cert. denied, 347 Conn. 904, 297 A.3d 198 (2023);

---

ceeded—is that, in paragraphs 7 and 12 of the complaint, the plaintiff merely was trying to establish the defendant's malice by demonstrating that the defendant had selected an especially disturbing depiction, either of his work or of dental work in general.

*Randolph* v. *Mambrino*, 216 Conn. App. 126, 152–53, 284 A.3d 645 (2022); *C. B.* v. *S. B.*, 211 Conn. App. 628, 629–31, 273 A.3d 271 (2022). We would be loathe to hold the trial court to a higher standard than we hold ourselves to or to demand greater solicitousness to self-represented litigants than we ourselves are prepared to indulge.

Although, from one perspective, it might have been supererogatory—morally praiseworthy, above and beyond the call of duty—for the trial court to canvass the self-represented plaintiff, help him ferret out and articulate any potentially cognizable claims hidden in his complaint, and then to invite him to properly replead them, we are not prepared to say that such assistance was legally required. As the United States Supreme Court has explained on more than one occassion, "the trial [court] is under no duty to provide personal instruction on courtroom procedure or to perform any legal chores for the [self-represented party] that counsel would normally carry out." (Internal quotation marks omitted.) *Martinez* v. *Court of Appeal of California, Fourth Appellate District*, 528 U.S. 152, 162, 120 S. Ct. 684, 145 L. Ed. 2d 597 (2000); see also *Pliler* v. *Ford*, supra, 542 U.S. 231 (trial courts "have no obligation to act as counsel or paralegal to [self-represented] litigants"). Indeed, "[r]equiring [trial] courts to advise a [self-represented] litigant in such a manner would undermine [the trial courts'] role as impartial [decision makers]." *Pliler* v. *Ford*, supra, 231; see also part II D of this opinion.

Third, for the trial court to reach out and help the plaintiff to articulate and plead an additional claim that was not apparent on the face of the complaint, and of which the defendant was unaware, not only would have risked creating an appearance of partiality but also would have interfered with the defendant's own rights. Facing rising cost pressures, publishers rely heavily on stock images to illustrate their stories. See, e.g.,

Idlibi *v.* Hartford Courant Co.

J. Hecker, Comment, "Contracting and the Rights of Photographers," 53 Case W. Res. L. Rev. 659, 661 (2003); B. Seecof, Comment, "Scanning into the Future of Copyrightable Images: Computer-Based Image Processing Poses a Present Threat," 5 High Tech. L.J. 371, 390 (1990). Imposing liability on a newspaper because readers could possibly misconstrue a stock image as depicting the people discussed in the accompanying article would be unprecedented,[9] and would risk seriously chilling core first amendment expression on matters of public concern.[10]

The defendant, as a news organization, has a powerful interest in not having to defend frivolous defamation claims when it publishes on matters of public concern, such as children's health and Medicaid fraud. See *Smith* v. *Supple*, 346 Conn. 928, 943–44, 293 A.3d 851 (2023);

[9] Almost all of the published defamation cases involving stock images run in the other direction. The defendant newspaper uses a stock image, allegedly without the consent of the subject of that image, to illustrate a story of illegality or iniquity, and the subjects of the image, who are wholly innocent, contend that they were defamed when readers assumed that they were the ones who engaged in the depraved conduct. See *Southeastern Newspapers, Inc.* v. *Walker*, 76 Ga. App. 57, 59, 44 S.E.2d 697 (1947) (discussing "the usual line of cases [in which] the portrait of the person alleged to have been [libeled] is accompanied by an article [that] is either libelous per se or per quod"); see also, e.g., *Peck* v. *Tribune Co.*, 214 U.S. 185, 188, 29 S. Ct. 554, 53 L. Ed. 960 (1909) (portrait of plaintiff used to illustrate story about nurse who recommended whisky as medicinal tonic); *Stanton* v. *Metro Corp.*, 438 F.3d 119, 122–23 (1st Cir. 2006) (photograph of plaintiff used to illustrate story about teenage sexual promiscuity); *Prystash* v. *Best Medium Publishing Co.*, 157 Conn. 507, 508–10, 254 A.2d 872 (1969) (photograph of plaintiff used to illustrate story about another woman who committed felony). In this case, by contrast, the plaintiff was the one who was involved in the illegal and unethical conduct reported in the articles. His claim is merely that the stock photograph, if misunderstood, might have made his misconduct appear even more opprobrious than it actually was.

[10] The high court of the state of New York, home to the world's publishing capital, has repeatedly warned, albeit in a distinct, statutory context, of the constitutional risks of imposing liability when a newspaper's use of a stock photograph in conjunction with an article on matters of public interest risks creating a false impression in the minds of readers. See generally *Messenger ex rel. Messenger* v. *Gruner + Jahr Printing & Publishing*, 94 N.Y.2d 436, 442–43, 727 N.E.2d 549, 706 N.Y.S.2d 52 (2000).

Idlibi *v.* Hartford Courant Co.

see also General Statutes § 52-196a (anti-SLAPP statute); *Tomkiewicz* v. *Detroit News, Inc.*, 246 Mich. App. 662, 666, 635 N.W.2d 36 (2001) ("[W]e must consider society's interest in free expression, in addition to the interests of the individual parties. . . . [S]ummary disposition is an essential tool in the protection of [f]irst [a]mendment rights." (Internal quotation marks omitted.)). It would make little sense to encourage or require the trial court to affirmatively assist the plaintiff in articulating and pleading an ill formed defamation claim that may intrude into constitutionally protected territory and that could expose the defendant to costly litigation for exercising its free speech rights, contrary to the established policy of our state.[11]

Fourth, had this case been allowed to proceed, for the plaintiff to have prevailed on the photograph claim would have been a Herculean task. He would have to establish that the photograph made an implicit truth claim—that this was a photograph of the plaintiff performing a procedure on a child—such that it was a possible means of defamation.[12] See, e.g., *NetScout Systems, Inc.* v. *Gartner, Inc.*, 334 Conn. 396, 413–14, 223 A.3d 37 (2020) (statement in question must be susceptible of being proved true or false, or subject to objective verification); see also *Powell* v. *Jones-Soderman*, 849 Fed. Appx. 274, 277 (2d Cir. 2021) ("in a suit by a private plaintiff involving a matter of public concern . . . allegedly defamatory statements must be provably false, and the plaintiff must bear the burden of proving falsity" (internal quotation marks omitted)). The plaintiff would have to establish that "an important and respectable" subset of readers would not have understood that the photograph might be a stock image, even though stock

___

[11] To be clear, we do not foreclose the possibility that a publication's use of a stock image might be so misleading and defamatory as to take it outside the protections of the first amendment. That is a question for another day.

[12] Of course, he would also have to establish the falsity of those claims and, potentially, actual malice, as well.

photographs are widely used in newspapers, and the defendant's first article attributed the one at issue to the Associated Press. *Peck* v. *Tribune Co.*, 214 U.S. 185, 190, 29 S. Ct. 554, 53 L. Ed. 960 (1909); see also 3 Restatement (Second), Torts § 559, comment (e), p. 157 (1977) (communication must tend to prejudice plaintiff "in the eyes of a substantial and respectable minority" of his associates). He would have to establish that the procedure depicted in the photograph is significantly more disturbing than run-of-the-mill dental procedures ranging from fillings to root canals, all of which involve sticking foreign metal implements into the mouths of patients under bright lighting, often accompanied by pain and blood. See, e.g., *Strada* v. *Connecticut Newspapers, Inc.*, 193 Conn. 313, 322, 477 A.2d 1005 (1984) ("[t]he issue is whether the libel, as published, would have a different effect on the reader than the pleaded truth would have produced" (internal quotation marks omitted)).

Finally, and perhaps most significant, to establish more than nominal damages, the plaintiff would have to prove that it was the stock photograph, rather than the information contained in the articles—that he had been twice disciplined, and placed on probation, for various professional misconduct—that led his patients to leave his practice. This would be particularly difficult to establish because it is counter to the plaintiff's own sworn statements. In his February 12, 2021 affidavit, for example, the plaintiff stated: "I lost around 70 [percent] of my established [patient] pool. When my staff attempted to confirm my patients' appointments, many of their parents indicated that they would not bring their children to a dentist who abuses drugs." Further, the plaintiff represented in his complaint that a substantial portion of his income is derived from referrals from general dentists in the community, and he implied that a drop-off in those referrals, as well as negative television

Idlibi *v.* Hartford Courant Co.

news coverage of his misconduct (factors that have little, if anything, to do with the photograph), was the cause of his lost income. For these reasons, we are unable to find fault with the trial court for not denying the defendant's motion for summary judgment as to a claim that the plaintiff never pleaded and that is undercut by his own sworn representations.

C

We next consider what appears to have been the plaintiff's primary claim (as to the photograph) before the trial court and what is, perhaps, an alternative claim on appeal. Relying on the decision of the Appellate Court in *Burton* v. *American Lawyer Media, Inc.*, 83 Conn. App. 134, 847 A.2d 1115, cert. denied, 270 Conn. 914, 853 A.2d 526 (2004), the plaintiff appears to have proceeded on the theory that the fair report privilege will be defeated if the defendant acted with what the plaintiff calls "actual malice," by which he appears to mean malice in fact.[13] In other words, his main purpose in referencing the photograph in his briefing to the trial court was to immunize his five defamation claims against the defendant's fair report defense, rather than to set out a distinct, sixth claim.

[13] It is unclear to what extent the plaintiff's frequent references to "actual malice" and purported evidence that the defendant exhibited actual malice toward him reflect a misunderstanding of the meaning and legal import of that term in first amendment jurisprudence. See *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279–80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964) ("[t]he constitutional guarantees require . . . a federal rule that prohibits a public official from recovering damages for a defamatory *falsehood* relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not" (emphasis added)); see also *Gleason* v. *Smolinski*, supra, 319 Conn. 432–33 n.32, 447, 452 (corrupt motive and intent to inflict harm do not establish actual malice under *Sullivan*). As we discuss in this part of the opinion, if a statement is true, or if it is protected by the fair report privilege, then it is protected speech, and neither the defendant's attitude toward its truth (the *actual malice* question) nor the defendant's attitude toward the plaintiff (the *malice in fact* question) is legally relevant.

Idlibi *v.* Hartford Courant Co.

The plaintiff's reliance on *American Lawyer Media, Inc.*, while understandable, is misplaced. It is true that, in *American Lawyer Media, Inc.*, the Appellate Court stated that fair reporting is a conditional privilege that will be defeated by malicious intent. Id., 138. The statement was dictum in that case, however, as there was no evidence of malice. See id. Moreover, the case that *American Lawyer Media, Inc.* cited for the proposition, *Bleich* v. *Ortiz*, 196 Conn. 498, 504, 493 A.2d 236 (1985), spoke generally of conditional privileges but did not say that fair reporting is a conditional privilege; indeed, there is no mention of the fair report privilege in that opinion.

In any event, *American Lawyer Media, Inc.* does not reflect an accurate statement of Connecticut law. Rather, we adhere to the modern view that, for the fair report privilege to attach, a defendant need only establish that it has provided a fair and substantially accurate account of the proceedings. See, e.g., *Elder* v. *21st Century Media Newspaper, LLC*, 204 Conn. App. 414, 428, 254 A.3d 344 (2021) (clarifying *American Lawyer Media, Inc.*, and explaining that malice does not defeat fair report privilege); *Salzano* v. *North Jersey Media Group, Inc.*, 201 N.J. 500, 530, 993 A.2d 778 (2010) ("[u]nder [the] modern trend of the law, the accurate reporting of [official] proceedings results in complete immunity, regardless of the knowledge or motive of the publisher" (internal quotation marks omitted)), cert. denied, 562 U.S. 1200, 131 S. Ct. 1045, 178 L. Ed. 2d 864 (2011); 3 Restatement (Second), supra, § 611, comment (a), pp. 297–98 (fair report privilege is broader in scope than conditional privilege and is abused only when publisher does not give fair and accurate report of proceeding). Demonstrating actual malice might have been *necessary* for the plaintiff's defamation claims to proceed; see footnote 7 of this opinion; but neither actual malice nor malice in fact is *sufficient*.

Idlibi *v.* Hartford Courant Co.

Of course, if the photograph is unrelated to the proceedings before the dental commission, as appears to be undisputed, then the fair report privilege does not apply to it. In that case, the defendant would not be protected from claims of defamation *as to the photograph*, regardless of motive. But the defamation still must be alleged. It was not.

D

Finally, we address the thoughtful and thorough dissenting opinion. It is unclear to us to what extent the dissent disagrees as to the degree to which a trial court reasonably can and should be solicitous of self-represented litigants, and to what extent we simply read differently the record in this case. We will briefly address both points.

We recognize, of course, the increasing prevalence of self-represented parties in our courtrooms, and we both appreciate and share the dissent's deep commitment to providing meaningful access to justice for those litigants. No one could quibble with the body of authorities the dissent has marshaled to that end.

At the same time, we do not understand the dissent to disagree that helping self-represented litigants in their pursuits is not an absolute obligation; nor does it always outweigh other considerations. Other important values and ends may come into conflict and need to be balanced, from the efficient administration of justice to fairness to opposing parties. Of particular importance to the present matter, we must be careful that judges, in the course of shepherding self-represented litigants through the trial process, do not shed the neutrality, or appearance thereof, that is so central to our judicial roles. The authorities on this side of the ledger are equally voluminous.

Where to strike the balance? Guidance comes from rule 2.2 of the Code of Judicial Conduct, which requires

Idlibi *v.* Hartford Courant Co.

that judges "perform all duties of judicial office fairly and impartially." The commentary to the rule clarifies that "[i]t is not a violation of this [r]ule for a judge to make *reasonable* accommodations to ensure self-represented litigants the opportunity to have their matters fairly heard." (Emphasis added.) Code of Judicial Conduct Rule 2.2, comment (4). The question, then, is whether it is a *reasonable* accommodation for a judge sua sponte (1) to recognize that a litigant has misunderstood a set of substantive legal principles and that, if the principles were properly understood, the litigant might be able to articulate an additional, relatively novel claim, (2) to take on the task of educating the litigant in the nuances of the law, and then (3) to invite the litigant to replead and allege that novel claim. None of the cases cited by the dissent comes close to suggesting that this would be appropriate—let alone required—conduct for a judge.

Which brings us to the specifics of this particular case, which, we suspect, are the true source of our disagreement with the dissent. By our count, on twenty-two separate occassions, the dissent implies, or outright contends, that the trial court did not "allow" or "permit" the plaintiff to revise his complaint to make a distinct defamation claim related to the photograph. In fact, the plaintiff never filed any motion or made any request to revise or replead. The trial court never denied any such motion or request. And the plaintiff never sought permission to state a claim relating to the photograph. The reality is that the closest the plaintiff ever came to making such a request was one generic sentence in his objection to the defendant's motion for summary judgment, in which he wrote: "The plaintiff respectfully requests the court to decide the [defendant's] motion [for summary judgment] as a motion to strike if the court finds that any of the plaintiff's pleadings are legally insufficient." There was no futher discussion of or action on that

Idlibi *v.* Hartford Courant Co.

request. The dissent would have us hold that the court should have used that generic request as the hook by which to educate the plaintiff about the law of defamation, to explain the possible existence of a potential additional claim, and to encourage the plaintiff to bring that claim. We can debate whether those would have been reasonable accommodations, but we should be clear that the plaintiff was never denied the right or opportunity to revise his complaint.[14]

This flows from, and encapsulates, a broader disagreement as to the record. The dissent appears to assume that, all along, the plaintiff was trying his best to state a distinct defamation claim relating to the photograph but that he just failed to use the correct "magic words" needed to articulate that claim in a legally cognizable manner. The defendant then somehow tricked him into not clarifying his claim when given the chance to do so, and the trial court, recognizing all of this, unobligingly granted the motion for summary judgment as to the claim rather than extending the self-represented plaintiff the basic courtesy of explaining *why* the court was rejecting the claim, so that he could properly replead it.

Perhaps that's what happened, but it's not how we read the record. The concept that a photograph may have a propositional truth value, such that it can make a false, defamatory "statement" about someone, is not an obvious one. As we discussed, the cases that have entertained such a theory are few in number and narrow in scope. Nothing in this record suggests that the plain-

---

[14] The dissent suggests that the plaintiff should have been provided an opportunity to file a substituted complaint in accordance with *American Progressive Life & Health Ins. Co. of New York* v. *Better Benefits, LLC*, 292 Conn. 111, 121–25, 971 A.2d 17 (2009), and *Larobina* v. *McDonald*, 274 Conn. 394, 400–403, 876 A.2d 522 (2005). See part III B 1 of the dissenting opinion. The plaintiff advanced no such contention in this court until filing a motion for reconsideration, and we decline to consider that new argument on reconsideration. Nothing in our determination of the present case should be understood to affect or alter our holdings in those cases.

tiff had any idea that such a claim might be available to him until his case was on appeal. Rather, there is every indication that his occasional references to the photograph evidenced, in his mind, nothing more than a mal-intent on the part of the defendant. So, it's not that he used the wrong *words* to state the claim, a mere "pleading deficiency" or "technicality," as the dissent puts it. Part V of the dissenting opinion. He had the wrong *ideas*, and so didn't even know that he had a potential claim.

We think that for the trial court to have educated the plaintiff about, and helped him to develop, potential legal theories with which he was unfamiliar would be to take more than one step over the line of impartiality. To then have to litigate those theories, however frivolous, would place a burden on the defendant that it would not have otherwise faced.

Finally, we think that the dissent overlooks a critical distinction when it suggests that there is no difference between, on the one hand, a claim that the subject of a stock photograph has been defamed by the juxtaposition of that photograph with an article discussing illegal or immoral conduct (a legal theory that various cases have recognized) and, on the other hand, a claim that the subject of an article about illegal, immoral conduct has been defamed by juxtaposition with a stock photograph depicting arguably worse, or at least different, bad conduct. The latter would open a Pandora's box that the former does not; any individual discussed in any article accompanied by a stock photograph could allege that readers might confuse them with a subject in the photograph and contend that the comparison is somehow unflattering and defamatory. This may be why no known judicial decision has ever recognized the theory that the dissent chides the trial court for not helping the plaintiff articulate. And, surely, the fact that

Idlibi *v.* Hartford Courant Co.

the interests involved are subject to special constitutional protections is not without relevance here.

Our ultimate concern, with respect to self-represented litigants, as with all others, is that due process be afforded and justice be done. In close cases—let us assume, for the moment, that this was a close case—we must defer to the discretion of the trial court as to how far it reasonably can go in accommodating self-represented litigants while preserving judicial economy, neutrality, and fairness to opposing parties. When a trial court is invited to provide assistance approaching the outer limits of judicial impartiality, going well beyond accommodations as to merely technical requirements, part of that discretion reasonably may involve an assesment of whether the case is one that should be encouraged to proceed. We have no doubt that there are cases in which our trial courts could do more to ensure that a party's inability to obtain professional representation does not work an injustice. This is not such a case.

The judgment of the Appellate Court is affirmed.

In this opinion ROBINSON, C. J., and MULLINS, DANNEHY and WESTBROOK, Js., concurred.

ECKER, J., with whom D'AURIA, J., joins, dissenting. I will readily stipulate that the majority shares my commitment to providing meaningful access to justice for self-represented litigants. There also is no doubt in my mind that the majority appreciates the nature and extent of the challenge that self-represented parties pose to the administration of justice in a juridical system governed by a labyrinthine network of highly technical substantive and procedural rules developed by and for legal professionals. Nor do I deny that the majority cares about the difficulties confronted by nonlawyers attempting to navigate this unfriendly territory. The

Idlibi *v.* Hartford Courant Co.

good faith of the majority, however, does nothing to blunt my conviction that its decision today represents a step in the wrong direction for the fair treatment of self-represented parties in our civil justice system. In the name of judicial neutrality, the majority endorses an adjudicatory framework that, in operation, inevitably will result in self-represented parties losing their cases at the earliest stages of litigation simply because they do not know and cannot hope to learn the arcane peculiarities of our rules of practice. The trial court may demonstrate solicitude, according to the majority, only when the accommodation is inconsequential, i.e., when the judicial intervention would not assist the self-represented party's struggling efforts to articulate a legally cognizable claim based on the underlying facts alleged or reasonably implied in the complaint.

The majority's choice to endorse an absolutist regime of strict judicial neutrality in this setting is unfortunate and unnecessary. As we shall see, our rules of judicial conduct encourage trial courts to affirmatively accommodate the needs of nonlawyer litigants in a manner that gives them a fair opportunity to win or lose their cases on the merits. This approach mirrors the one taken by federal courts, which similarly express a preference for trial courts to assist self-represented litigants in navigating the pitfalls of the legal system. In particular, federal courts hold that a complaint drafted by a self-represented litigant should not be dismissed prior to trial, unless there is no doubt that the factual allegations in the complaint cannot state a claim under any cognizable legal theory and permitting amendment of the complaint would be futile. This model, which is wholly consistent with our own rules and principles applicable to the construction of pleadings filed by self-represented parties, stands in sharp contrast to the approach taken by the majority, which, for all practical purposes, holds self-represented parties to the same standards as lawyers.

Idlibi *v.* Hartford Courant Co.

In my view, neither the trial court, the Appellate Court, nor this court has exhibited the requisite solicitude toward the self-represented plaintiff, Ammar Idlibi, in the present case. He has been treated as if he were represented by trained legal counsel, and his claim of defamation has been thrown out with prejudice and without an opportunity to correct its easily curable deficiencies. Contrary to the majority's assertion, the plaintiff requested an opportunity to replead[1] and was "denied the right or opportunity to revise his complaint" to plead a legally sufficient cause of action. Part II D of the majority opinion. More to the point, even if the plaintiff had not known enough to ask for leave to replead, the trial court was obligated to offer him that opportunity before terminating his case with prejudice on the face of the original complaint. It would have demonstrated no inappropriate partiality if the trial court had identified a specific pleading defect and provided the plaintiff an opportunity to replead to cure that defect. Likewise, a defendant suffers no legally cognizable prejudice when a party, self-represented or not, is given a chance to cure a pleading defect of the nature at issue in the present case.

For these reasons, as more fully explicated herein, I respectfully dissent.

I

Members of the bench and bar increasingly express grave concern over the growing number of self-represented parties flooding our courts. "Access to justice" is the slogan of the day. Judges, lawyers, scholars, legislators, and other well-meaning souls convene task

---

[1] The majority asserts that "the plaintiff never filed any motion or made any request to revise or replead." Part II D of the majority opinion. In fact, the plaintiff's written objection to the defendant's motion for summary judgment explicitly states that "the plaintiff maintains that his pleadings are legally sufficient but would offer to amend his pleadings if the [trial] court concludes otherwise."

Idlibi *v.* Hartford Courant Co.

forces and committees, host symposia, commission reports, and write articles for the purpose of developing innovative reforms to provide all individuals—especially those without lawyers—meaningful recourse through our judicial system. The concern is well-founded: although "a definitive national picture on pro se litigation is lacking, it is not improbable to estimate that [two thirds] of all cases in American civil trial courts involve at least one unrepresented individual. In short, the magnitude of the pro se crisis is immense." J. Steinberg, "Demand Side Reform in the Poor People's Court," 47 Conn. L. Rev. 741, 751 (2015); see id., 749–52. In Connecticut, recent statistics show that, in 2023, at least one party was self-represented in 23 percent of civil cases, a statistic that does not even include family or housing courts, where the number of cases with at least one unrepresented party soars to 81 percent and 65 percent, respectively.[2] Whether by choice or necessity, self-represented litigants have become a substantial and, by all appearances, permanent part of our civil justice system.

Unfortunately, as the present case well illustrates, we have not yet figured out even the most basic design of a system of rules and practices that will provide self-represented parties a meaningful opportunity to obtain justice in cases in which they face professional adversaries in litigation. The consequences that attend this reality are obvious to anyone watching. When a self-represented layperson faces off in litigation against a lawyer, the self-represented party should expect to lose the case, often in short order. The legal system was designed by lawyers (judges are lawyers, too) for lawyers, and it is no surprise that members of the profession enjoy a vast home field advantage. Litigation is not for amateurs. The statistics bear out this fact in dramatic

---

[2] Connecticut Judicial Branch, Performance Management: Judicial Branch Statistics (last updated 2023).

Idlibi *v.* Hartford Courant Co.

fashion.[3] To prevail in a case—indeed, even to reach trial on the merits—usually requires a level of knowledge and degree of skill unattainable without years of education, training, and experience. A nonlawyer is very likely to fall victim to one of the fatal traps that the profession has laid in the endless expanse of arcane, complex, and too often vexing rules of practice and procedure, not to mention the vast landscape of similarly impenetrable substantive legal doctrines that govern any particular dispute. As this court observed almost one century ago, "[a] party who, unskilled in such matters, seeks to remedy some claimed wrong by invoking processes [that] are at best technical and complicated, is very ill advised and assumes a most difficult task." *O'Connor* v. *Solomon*, 103 Conn. 744, 745, 131 A. 736 (1926).[4]

---

[3] See M. Levy, Comment, "Empirical Patterns of Pro Se Litigation in Federal District Courts," 85 U. Chi. L. Rev. 1819, 1838 (2018) (The author concluded, based on statistics from 1998 to 2017, that "the presence of a [self-represented] plaintiff or . . . defendant dramatically changes the dynamics of litigation. When both parties are represented and there is a recorded final judgment for either the plaintiff or the defendant, the plaintiff and the defendant each win roughly 50 percent of the time. When the plaintiff proceeds [in a self-represented capacity], the plaintiff instead wins about 4 percent of the time. When the defendant proceeds [in a self-represented capacity], the plaintiff wins 86 percent of the time. These differences are stark. A represented defendant will nearly always prevail over a [self-represented] plaintiff in court. A represented plaintiff will win almost as consistently against a [self-represented] defendant."). The lawyer versus nonlawyer scenario is common. See D. Swank, Note, "The Pro Se Phenomenon," 19 BYU J. Pub. L. 373, 376 (2005) ("[w]hile in many cases both sides will be unrepresented, in perhaps [one third] or more of all litigation, a [self-represented] litigant opposes a represented party").

The dramatic contrast reflected in these statistics does not necessarily mean that the sole or even primary cause of the differential outcome is the appearance of counsel for one party but not the other; it may be more difficult to retain counsel, for example, if the case is a weak one. See M. Levy, supra, 85 U. Chi. L. Rev. 1838–39. Even noting this qualification, whatever its validity, the judiciary must do its best to ensure that a self-represented party does not lose his or her case *because* he or she is a layperson unfamiliar with technical rules of pleading or pretrial procedure, rather than because the case lacks merit.

[4] The point is captured in the well-known adage that a person who represents himself in a lawsuit has a fool for a client. The saying can refer to two different disadvantages encountered by self-represented parties.

Idlibi *v.* Hartford Courant Co.

The facts of the present case provide a textbook example of what so often happens in this situation. Regardless of the merits of his defamation lawsuit,[5] the nonlawyer plaintiff had an exceedingly small chance of prevailing as a self-represented party against the able and experienced team of lawyers appearing on behalf of the defendant, Hartford Courant Company. Predictably, the plaintiff's case was lost by dispositive motion long before any trial was held. This outcome meant that his defamation action was terminated, with prejudice, without a jury trial, which is no trivial matter in a system that operates under a constitution that confers to all persons a right

One, which is the focus of this opinion, involves the difficulty that a nonlawyer will have navigating the technicalities and intricacies of the applicable legal rules. See, e.g., *United States* v. *Bisong*, 645 F.3d 384, 388–89 (D.C. Cir. 2011) (The trial court had admonished the defendant that "a person who represents [himself] has a fool for a client," explaining that even "[t]he most sophisticated lawyers that practice in this courthouse would have a hard time trying this case because of the subtleties and because of the complexities of the way the evidence, the documentary evidence, the evidence that has susceptibility to objections and so forth are shaped. . . . If you go to trial [without counsel] . . . I [will] hold you to the same rules as I hold any lawyer. . . . So you would have to do what any person who represents a party before the court has to do and that is come up to speed on everything that you need to know in order to try a case. . . . So I want to impress [on] you . . . the perils of trying to do something [that] most good lawyers cannot do themselves because [the court is] not going to change the rules for you." (Internal quotation marks omitted.)).

The saying also conveys the different but equally valid cautionary observation that "[e]ven a skilled lawyer who represents himself is at a disadvantage in contested litigation. Ethical considerations may make it inappropriate for him to appear as a witness. He is deprived of the judgment of an independent third party in framing the theory of the case, evaluating alternative methods of presenting the evidence, cross-examining hostile witnesses, formulating legal arguments, and in making sure that reason, rather than emotion, dictates the proper tactical response to unforeseen developments in the courtroom. The adage that 'a lawyer who represents himself has a fool for a client' is the product of years of experience by seasoned litigators." (Footnote omitted.) *Kay* v. *Ehrler*, 499 U.S. 432, 437–38, 111 S. Ct. 1435, 113 L. Ed. 2d 486 (1991).

[5] The complaint contains four counts, three of which, at bottom, were founded on the allegations of defamation. The viability of a single aspect of the defamation claim is the only issue before this court.

Idlibi *v.* Hartford Courant Co.

of access to the courts and a right to trial by jury. Of course, lawyers also frequently lose cases by dispositive motion, but, in the present case, the result was attributable to a technical pleading error made by a nonlawyer who was never given an opportunity to cure the pleading defect, even though it would have been easy to do so in an amended complaint, with no unfairness to the defendant whatsoever. This outcome is inconsistent with our policy of showing solicitude to unrepresented litigants. See, e.g., *State* v. *Mark T.*, 339 Conn. 225, 232–33, 260 A.3d 402 (2021) (recognizing "the established policy of the Connecticut courts to be solicitous of [self-represented] litigants and when it does not interfere with the rights of other parties to construe the rules of practice liberally in favor of the [self-represented] party" (internal quotation marks omitted)).

The question for this court is whether this is the best we can do to provide a self-represented party with meaningful access to justice. I am certain that the answer is "no." We can do far better, without unfairness to anyone, and with the added benefit that the parties will walk away at the conclusion of the case, whatever the result, each having gotten a fair shake. That is no small thing.

II

Before addressing the precise steps that I believe the trial court should have taken in this case, I wish to highlight the deeply rooted principles that make self-representation a vital and important right in our justice system. These principles preclude courts from treating self-representation as an inconvenient impediment to the smooth administrative operation of the courts. To the contrary, the nature and dimensions of the right of self-representation explain why the judiciary must make all necessary efforts to avoid burdening this right with disadvantages so extreme that its exercise for all practi-

Idlibi *v.* Hartford Courant Co.

cal purposes guarantees failure to those naïve or foolish enough to take seriously the promise of justice for all.

History demonstrates that self-representation is a political and legal right held by the citizenry. This has been so for hundreds of years. "The right to appear in a court on one's own behalf is deeply rooted in American history and culture. In colonial times, notions of individualism and self-reliance, as well as widespread mistrust of lawyers, supported the [self-represented] litigant's choice of proceeding without [the] benefit of counsel. As early as 1789, Congress passed a statute providing federal litigants with the right to appear personally in all courts of the United States. [See 28 U.S.C. § 1654 (2018) (current version of statute).] In addition, most state constitutions either explicitly guaranteed the right of self-representation or implicitly guaranteed that right by providing for open access to the courts for redress of civil grievances." (Footnotes omitted.) A. Downey, Note, "Fools and Their Ethics: The Professional Responsibility of Pro Se Attorneys," 34 B.C. L. Rev. 529, 533–34 (1993);[6] see also R. Assy, Injustice in Person:

---

[6] It is well established that the right is guaranteed in criminal cases under the federal constitution. See, e.g., *Faretta* v. *California*, 422 U.S. 806, 818, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975) ("[t]he right of self-representation finds support in the structure of the [s]ixth [a]mendment, as well as in the English and colonial jurisprudence from which the [a]mendment emerged"); see also Conn. Const., art. I, § 8 (right to self-representation in criminal cases).

Although it is not necessary in the present case for me to demonstrate that the right of self-representation is of state constitutional magnitude in Connecticut civil cases, a strong argument can be made that the right is at the very least implicit in the open courts provision of the Connecticut constitution. See Conn. Const., art. I, § 10 ("[a]ll courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay"); see also *Bullard* v. *Morris*, 547 So. 2d 789, 790 (Miss. 1989) (considering article three, § 24, of Mississippi constitution, which is nearly identical to article first, § 10, of Connecticut constitution, as one of two constitutional provisions that support its conclusion that "it is without question that the Mississippi [c]onstitution permits a person to represent himself . . . in a civil proceeding"). See generally *State* v. *Diaz*, 226 Conn. 514, 533, 628 A.2d 567 (1993) ("[t]he declaration of rights adopted

350 Conn. 557     NOVEMBER, 2024     593

Idlibi *v.* Hartford Courant Co.

The Right to Self-Representation (Oxford University Press 2015) pp. 15–16.[7] See generally *Faretta* v. *California*, 422 U.S. 806, 818–32, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975) (discussing at length history of right to self-representation in criminal cases).

The political dimension of the right to self-representation is not a fanciful invention of academic theoreti-

in [the] 1818 [Connecticut constitution] appears to have its antecedents in the Mississippi constitution of 1817"); W. Horton, The Connecticut State Constitution (2d Ed. 2012) p. 47 ("[m]ost of the individual sections [of the Connecticut constitution's declaration of rights] come from the 1818 constitution, and most of these sections were lifted verbatim and without debate from the Mississippi [c]onstitution of 1817"). Article first, § 10, of the Connecticut constitution specifically "was taken verbatim from [a]rticle [f]irst, [§] 12, of the 1818 constitution," the draft of which "had been taken verbatim from the Mississippi [c]onstitution of 1817" and only slightly edited, swapping " 'lands, goods' " for " 'property.' " W. Horton, supra, p. 77; see also *Blair* v. *Maynard*, 174 W. Va. 247, 251, 324 S.E.2d 391 (1984) ("The right . . . to act as [one's] own attorney in civil proceedings . . . stands on equal footing with the parallel right accorded the criminally accused under [article third, § 14, of the] West Virginia [c]onstitution . . . . [Article third, § 17, of the] West Virginia [c]onstitution . . . provides, in pertinent part, that . . . '[t]he courts of [West Virginia] shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law . . . .' ").

[7] "One reason why self-representation may appear an axiomatic good is its long history. At common law, the idea that the litigant stands at the core of litigation and is free to decide whether to act in person or through counsel has remained impregnable through a long and dynamic history of change in almost every aspect of civil procedure. This remarkable survival of self-representation over centuries seems to have presented this form of representation as a self-evident and fundamental way through which the right of access to court can be exercised. The English Court of Appeal, for example, has celebrated the right to litigate in person as part of the British tradition, and as an important [well established] principle of the administration of justice that has been maintained throughout the years. In the same vein, the United States Court of Appeals for the Second Circuit [has] highlighted the importance of a right to self-representation in civil proceedings by pointing to its long history in English and American legal histories: it was already recognized in the United States in 1789, and has since remained constant for over 200 years. [*Iannaccone* v. *Law*, 142 F.3d 553, 556 (2d Cir. 1998).] [Although] a trial would almost certainly be calmer and easier for the [court] to manage if [the litigant] had not decided to represent himself, such considerations do not justify refusal of the historic statutory right of self-representation." (Footnotes omitted; internal quotation marks omitted.) R. Assy, supra, pp. 15–16.

Idlibi *v.* Hartford Courant Co.

cians; nor is it a relic of the past. One survey indicated that as few as 31 percent of self-represented litigants stated that they chose that status "because they could not afford to retain counsel." D. Swank, Note, "The Pro Se Phenomenon," 19 BYU J. Pub. L. 373, 378 (2005). "There are many reasons for the growth of pro se litigation other than the cost of securing legal assistance," including "increased literacy rates," an "increased sense of consumerism" and "individualism," "an [anti-lawyer] sentiment," "a mistrust of the legal system," a belief that the case is "simpl[e]," often because it involves a single issue, and a belief that "the court will do what is right whether the party is represented or not . . . ." Id., 378–79.[8]

This point warrants emphasis precisely because it is so tempting for judges, all of us, to view self-representation as a problem rather than a basic political and legal right.[9] In the press of business, and because so many of the legal intricacies that are foreign to nonlawyers are second nature to judges, it is sometimes too easy for us to be impatient with self-represented parties and to assume a correspondingly unaccommodating attitude,

[8] See R. Schneider, Comment, "Illiberal Construction of Pro Se Pleadings," 159 U. Pa. L. Rev. 585, 593–97 (2011) (discussing multitude of reasons litigants represent themselves). "[A] significant number of [self-represented] litigants in fact have funds to retain counsel, demonstrating that there are other, noneconomic reasons for their decisions to [represent themselves]." Id., 595–96. For example, "distrust of lawyers or the legal system in general" is one factor that leads litigants to forgo representation. Id., 596. Another factor is that "consulted counsel often advise litigants to proceed unrepresented because they believe certain cases are easy enough for the litigants to pursue without assistance." Id.; see also J. Goldschmidt et al., American Judicature Society, Meeting the Challenge of Pro Se Litigation: A Report and Guidebook for Judges and Court Managers (1998) p. 10 (citing "[a]nti-lawyer sentiment," "[t]he growth in do-it-yourself law businesses," "the breakdown of social institutions, including the family and religious institutions," and "[t]he recent cutbacks in federal and state legal services appropriations" among reasons litigation by self-represented parties is on rise).

[9] I intend no suggestion that the trial court in the present case exhibited such an attitude.

Idlibi *v.* Hartford Courant Co.

conveying the message that, if you want to represent yourself, you are on your own and deserve what you get. This perspective, although understandable at times, cannot become operative. A judge ordinarily should not hesitate to advise the litigant at the outset about the risks, and even folly, of proceeding without counsel, but, once the party has made an informed choice to proceed in a self-represented capacity, that choice must be treated with respect. "Th[e] constitutional right of access to the courts is not limited to those persons able and willing to employ an attorney. Litigants who, by choice or necessity, seek to advocate their own cause cannot be denied this fundamental right. As . . . another court [observed], 'the right to self-representation embodies one of the most cherished ideals of our culture; the right of an individual to determine his own destiny.' *People* v. *McIntyre*, [36 N.Y.2d 10, 14, 324 N.E.2d 322, 364 N.Y.S.2d 837 (1974)]. 'Like most fundamental freedoms, the right to [represent oneself] derives from the belief that respect for human dignity is best served by respect for individual freedom of choice.' *Soto* v. *United States*, 369 F. Supp. 232, 235–36 (E.D. Pa. 1973), aff'd [sub nom. *United States ex rel. Soto* v. *United States*, 504 F.2d 1339 (3d Cir. 1974)]." *Blair* v. *Maynard*, 174 W. Va. 247, 252, 324 S.E.2d 391 (1984).

To summarize, we cannot treat the long-standing right of self-representation as an unwelcome nuisance. Cases involving self-representation by nonlawyer civil litigants inevitably will cause systemic inefficiencies as compared to cases in which all parties are represented by counsel.[10] And, under our present system, self-representation may be a dubious choice for a litigant with sufficient funds to hire a lawyer. But it is flatly inappropriate for courts to allow these factors to affect their treatment of self-represented parties once it is clear that the liti-

_____

[10] See, e.g., S. Schwinn, "Faces of Open Courts and the Civil Right to Counsel," 37 U. Balt. L. Rev. 21, 55–58 (2007).

Idlibi *v.* Hartford Courant Co.

gant has made an informed choice to proceed without counsel. After the choice is made by the litigant, the court is obligated to be solicitous of the litigant in a manner that facilitates justice. This does not mean showing favoritism or providing partisan legal advice. But it does mean that the court must make reasonable efforts during pretrial proceedings[11] to explain what the legal rules require in a manner that will provide the self-represented party with fair notice and a meaningful opportunity to correct any curable defects that may otherwise prevent the case from being decided on its merits.

III

The focus of this appeal centers on the photograph that the defendant published to accompany two news articles about the disciplinary proceeding brought by the Department of Public Health (department) and the Connecticut State Dental Commission against the plaintiff for installing eight crowns on the teeth of a three year old child. The color photograph, reproduced in the appendix to this opinion, was an attention grabber. One could fairly call it sensationalist after learning that the procedure depicted in the photograph has nothing to do with the particular allegations against the plaintiff, a fact not disclosed in the articles. The photograph provides

_____

[11] My focus is on pretrial matters because that is the context in which this case arises. I expect that it is easier to calibrate and provide the appropriate level of solicitude to self-represented parties in pretrial proceedings than in a trial setting for a number of reasons. First, the objective of pretrial proceedings is not to adjudicate the merits of the claims and defenses but to determine (1) what precise claims and defenses are being made, and (2) whether those claims and defenses find sufficient legal and evidentiary support to require a trial on the merits. Second, at the pretrial stage, there typically (although not always) is time to permit a party to cure pleading or other deficiencies, if curable, without causing undue prejudice to the adverse party. To be clear, I do not propose that the principles of solicitude are inapplicable at trial, only that the issue requires careful consideration beyond the scope of this opinion.

Idlibi *v.* Hartford Courant Co.

an illuminated, close-up view of the hands of a dentist performing an endodontic procedure in a patient's open mouth. It treats the reader to a rather frightful scene, depicting numerous long metal rods inserted into the patient's gums. In the first publication, the photograph is accompanied by this caption: "A Terryville dentist, Ammar Idlibi, is being investigated by the state Department of Public Health for doing unnecessary and medically unsound work on children." In the second publication, the following caption appears beneath the photograph: "State Probes Terryville Dentist for Excessive Work on Children's Teeth."[12]

Without passing on the merits of a claim that the majority asserts has not yet even been pleaded, we must take seriously the contention that the defendant's use of the photograph and associated captions would be actionable on this record because a reasonable person could conclude that it grossly misrepresents the actual facts involved in the department proceeding against the plaintiff and does so in a manner substantially unfavorable to his professional reputation. A fact finder could reasonably conclude that a dentist performing the depicted procedure on children, without express authorization and to a greater extent than absolutely necessary, could be guilty of negligence or even worse. The same person could conclude that the publication was not protected by the public reporting privilege because the communication is neither a fair nor accurate report of the official proceeding. I am therefore unable to say at this stage that a legally viable claim of defamation has not and cannot be pleaded on this record. See part IV of this opinion.

---

[12] In the online version of the first publication, which is the only version in the court file, the photograph appears directly below the headline ("State Probes Terryville Dentist for Excessive Work on Children's Teeth") and byline, and directly above the text of the story, spanning the entire width of the news article. In the second article, the same photograph, slightly reduced in size, was embedded in the text toward the beginning of the article.

Idlibi *v.* Hartford Courant Co.

A

I will first describe the trial and appellate proceedings relevant to the issue before us. The litigation proceeded rapidly in the trial court from commencement to final disposition. The plaintiff filed his complaint in August, 2020; the defendant appeared by counsel in September, 2020, filed its answer and special defenses soon thereafter, and the pleadings were closed by mid-November, 2020. The defendant filed a motion for summary judgment in January, 2021, and the case was over when the motion was decided in the defendant's favor. I suspect that the defendant's choice to bypass any of the usual pretrial motions practice and to immediately seek summary judgment reflected a shrewd tactical decision to obtain a final disposition without providing the plaintiff an opportunity to amend his complaint and to fill in any missing pieces. The strategy employed by the defendant's counsel demonstrated a high degree of professional acumen and was entirely proper, but that is precisely my point: good lawyers take advantage of every available advantage, one of which is to limit the opponent's opportunity to fix his mistakes.

Importantly, the defendant's motion for summary judgment and supporting documentation studiously avoided any mention of the photograph or accompanying captions. This is so even though the photograph is expressly referenced in two different paragraphs of the defamation count contained in the plaintiff's complaint, and even though the allegations of the complaint fail to identify with particularity or certainty the material considered by the plaintiff to be defamatory.

Paragraph 7 of the complaint alleges: "The defendant was aware that the Connecticut State Dental Commission was expected to vote on disciplining the dental license of the plaintiff on September 5, 2018. On the morning of the same date of the expected voting, the defendant

Idlibi *v.* Hartford Courant Co.

rushed to publish a defamatory publication [concerning] the plaintiff, falsely publishing that the state [was] prob[ing] the plaintiff for excessive work on children's teeth. The defamatory publication was titled 'State Probes Terryville Dentist for Excessive Work on Children's Teeth.' The defendant conveyed the false objective fact that the state has been investigating the [plaintiff] for doing excessive work on children's teeth. *Under the publication headline, the defendant published a picture of a child who appears to be undergoing an invasive surgical procedure with long screw-like dental implants. The graphic picture was intentionally intended to incite public anger against the plaintiff. Under that graphic picture, the defendant identified the plaintiff by name in the following manner: 'A Terryville dentist,* [*the plaintiff*]*, is being investigated by the* [*department*] *for doing unnecessary and medically unsound work on children.*' " (Emphasis added.)

Paragraphs 11 and 12 of the complaint contain allegations relating to the second article. The photograph is again included in these allegations. These paragraphs allege:

"11. On September 5, 2018, the defendant published a second defamatory publication titled 'Dental Board Disciplines Terryville Dentist for Doing Unnecessary Work on 3-Year Old.' *In its second publication, the defendant did not give a fair and accurate report of the Dental Board's proceeding.*

"12. *In its second publication, the defendant published the same graphic picture of the child undergoing the invasive surgical procedure with long screw-like dental implants.*" (Emphasis added.)

The defamation count goes on to make a series of allegations that are not limited to any particular matters previously identified in the complaint. In vague and open-ended terms, the complaint alleges that the defen-

Idlibi *v.* Hartford Courant Co.

dant "published several defamatory false statements [concerning] the plaintiff," "recklessly made defamatory false statements conveying objective false facts regarding" the plaintiff, "published the false statements conveying false objective facts in spite of the defendant's actual knowledge of their falsity," "published the false statements with bad faith and improper motive," and "published the false statements with reckless disregard for their truth."

The defendant did not file a request to revise in accordance with Practice Book § 10-35, seeking clarification or particularization of the plaintiff's defamation claims. Nor, again, did the defendant address (or even mention) the photograph in any of the submissions it filed in support of its motion for summary judgment. Instead, the defendant proceeded as if the photograph and the plaintiff's allegations about it did not exist. Its motion papers exclusively targeted five other statements in the articles that it identified as lying at the center of the plaintiff's claim of defamation.[13] Thus was born the phrase, "five allegedly defamatory statements," which both the trial court and the majority have adopted as if it was an accurate description of the plaintiff's defamation claim. The defendant's strategy, if it was that, worked. The plaintiff's initial opposition papers responded to the defendant's

---

[13] The five statements identified by the defendant are: (1) "the article entitled State Probes Terryville Dentist for Excessive Work on Children's Teeth conveyed the false objective fact that the state had been investigating the defendant for doing excessive work on children's teeth," (2) "the [defendant] falsely published that the [department] conducted a two year investigation [of] the plaintiff," (3) "the [defendant] falsely published that the [department] ha[d] concluded that the work was unnecessary and medically unsound," (4) "the [defendant] falsely published that, [i]n Connecticut, just thirty-seven steel crowns were placed on [children] under general anesthesia who were insured by Medicaid in the last fiscal year," and (5) "the [defendant] falsely published that, in 2014, the plaintiff prescribed codeine, Xanax, Valium and other drugs to himself and [his] family, yet ha[d] been allowed to keep practicing and treating children." (Internal quotation marks omitted.)

Idlibi *v.* Hartford Courant Co.

motion by following the path laid by the defendant without any reference to the photograph.

The subject of the photograph was first mentioned in the plaintiff's surreply brief. The plaintiff at the time appeared to be proceeding on the understanding that actual malice, at least as demonstrated by defamatory statements unrelated to an official proceeding, defeated the defendant's ability to claim protection under the fair reporting privilege, and the plaintiff relied on the allegations relating to the photograph for the purpose of demonstrating malice and to thereby defeat the privilege. This argument is not artfully made, but it is clearly discernible in the plaintiff's surreply brief, in which the argument is explicitly tied to the photograph depicting the unrelated and gruesome looking implantation procedure that is the subject of this appeal. The surreply brief argues that, "[o]nce the plaintiff presents a factual predicate for his contention that the defendant's actions were taken with malice, all claimed privileges are lost, and the motion for summary judgment must be denied. See, e.g., *Wadia Enterprises, Inc.* v. *Hirschfeld*, [224 Conn. 240, 250, 618 A.2d 506 (1992)]; *Abdelsayed* v. *Narumanchi*, [39 Conn. App. 778, 781, 668 A.2d 378 (1995), cert. denied, 237 Conn. 915, 676 A.2d 397, cert. denied, 519 U.S. 868, 117 S. Ct. 180, 136 L. Ed. 2d 120 (1996)]; *Chadha* v. *Shimelman*, 75 Conn. App. 819, 831, 818 A.2d 789, cert. denied, 264 Conn. 909, 826 A.2d 180 (2003). This alone is more than sufficient to defeat the defendant's reliance on its claimed privilege." Immediately thereafter, the plaintiff gives seven instances of allegations that he claims defeat the privilege, including the following: "The plaintiff asserted in his complaint [specifically, in paragraphs 7 and 12] . . . that the defendant published on the cover of the first publication *and* in the body of the second publication a graphic picture of a child undergoing an invasive surgical procedure with long screw-like dental implants to incite public anger

Idlibi *v.* Hartford Courant Co.

against the plaintiff. The defendant affirmed this assertion in its own exhibit [namely, the affidavit of Matthew Ormseth, who authored the two articles] . . . . The defendant failed to refute the plaintiff's factual predicate that the unrelated graphic picture was published with actual malice." (Citations omitted; emphasis in original.)

The plaintiff again sought to bring the trial court's attention to the photograph during oral argument on the motion for summary judgment. He stated: "Nobody [has] addressed the graphic picture that you've seen, Your Honor . . . with all those long, big screws sticking out of the child's mouth. Nobody [has] addressed that. Counsel didn't mention anything about that. Why would somebody publish such a big, graphic picture of this child with . . . screws [sticking] out of his mouth? What's the point? That's not even related to a crown. Those are not crowns. They are like dental—I don't even—I never heard—I'm a pediatric—I'm a board-certified pediatric dentist. We don't even do this on children, with these kind[s] of implements sticking out of the mouth of a child . . . . I've never done this before. It's unheard of. I don't know where [the defendant] got this picture from, but this was obviously, intentionally made with ill intention and bad faith. Again, that's for the jury to decide under the preponderance of the evidence standard of proof."

The trial court granted the defendant's motion for summary judgment on all counts. The photograph is never mentioned in its memorandum of decision, not even to explain why the court considered it irrelevant or unhelpful to the plaintiff's position. With respect to the defamation claim, the court quoted *Elder* v. *21st Century Media Newspaper, LLC*, 204 Conn. App. 414, 422, 254 A.3d 344 (2021), in finding that four of the five statements that were the subject of the motion for summary judgment were protected under the fair reporting privilege as "an 'accurate and complete or a fair abridgement' of"

Idlibi *v.* Hartford Courant Co.

events. The court concluded that the one other statement identified by the defendant as relevant, relating to the number of crowns placed on children's teeth annually, was not covered by the privilege but was not defamatory because it was substantially true.[14]

In the Appellate Court, the plaintiff argued that the information communicated by the photograph was not protected under the fair reporting privilege because the photograph was, in fact, unrelated to the dental commission proceeding and did not fairly and accurately report on the proceeding. See *Idlibi* v. *Hartford Courant Co.*, Conn. Appellate Court Briefs & Appendices, September Term, 2022, Plaintiff's Brief pp. 24–25. In a footnote, the Appellate Court stated that it would not review the plaintiff's claim of error relating to the photograph because the plaintiff never "distinctly raised" the claim before the trial court. *Idlibi* v. *Hartford Courant Co.*, 216 Conn. App. 851, 862 n.11, 287 A.3d 177 (2022). Except to say that it was included in the article and that the parties agreed that it did not depict the plaintiff or his patient, the photograph is not otherwise mentioned in the Appellate Court opinion. See id., 856 and n.6.

B

The majority concludes that the trial court properly granted the defendant's motion for summary judgment

---

[14] In response to a motion for articulation filed by the plaintiff pending appeal, the trial court explained that "it did not reach the plaintiff's allegations of malice, recklessness, motive, or intent in rendering its decision on summary judgment." The court further stated: "The fair report privilege applies even assuming, arguendo, [that] the plaintiff could prove those allegations. 'The privilege exists even though the publisher himself does not believe the defamatory words he reports to be true, and even when he knows them to be false and even if they are libel per se.' *Elder* v. *21st Century Media Newspaper, LLC*, [supra, 204 Conn. App. 422], quoting *Burton* v. *American Lawyer Media, Inc.*, 83 Conn. App. 134, 138, 847 A.2d 1115, cert. denied, 270 Conn. 914, 853 A.2d 526 (2004), and citing 3 Restatement (Second), Torts § 611, comment (a), p. 298 (1977)."

Idlibi *v.* Hartford Courant Co.

because the plaintiff's allegations relating to the photograph were not pleaded or advanced[15] in support of a claim that the photograph was "independently defamatory" but, instead, were made only to demonstrate that the defendant acted with malice. Part II of the majority opinion. The majority observes that the plaintiff's choice to represent himself carried with it a corresponding obligation to know and comply with the " 'relevant rules of procedural and substantive law.' " Part II A of the majority opinion, quoting *Traylor* v. *State*, 332 Conn. 789, 806, 213 A.3d 467 (2019). It reasons that, although the plaintiff had "every right to act as his own advocate . . . when he elects to do so, he takes the risk that because of his inexperience and lack of knowledge, he will suffer disadvantages to which, with proper representation, he would not be subject." (Citation omitted; internal quotation marks omitted.) Part II A of the majority opinion. The majority also asserts that trial courts are not allowed to make any "special allowances" to permit the plaintiff to avoid the fatal consequences of his defective pleading because they may not deviate from their assigned roles as neutral decision makers. Id. It concludes that the trial court was under no obligation to "help [the plaintiff] ferret out and articulate any potentially cognizable claims hidden in his complaint, and then to invite him to properly replead them . . . ." Part II B of the majority opinion. Indeed, according to the majority, "reach[ing] out and help[ing] the plaintiff to articulate and plead an additional claim that was not apparent on the face of the complaint, and of which the defendant was unaware, not only would have risked creating an appearance of partiality but also would have interfered with the defendant's own rights." Id.

---

[15] The majority also appears to agree with the Appellate Court that the plaintiff failed to distinctly raise in the trial court his claim that the photograph related allegations are sufficient to support a claim of defamation and, therefore, failed to preserve this claim for appellate review. See part II B of the majority opinion; see also footnote 17 of this opinion. The majority nonetheless addresses the claim, as do I.

Idlibi *v.* Hartford Courant Co.

Before discussing the flaws in these arguments, I pause to address the Appellate Court's conclusion that the defendant's claim was not preserved for appellate review because it was not "distinctly raised" in the trial court. *Idlibi* v. *Hartford Courant Co.*, supra, 216 Conn. App. 862 n.11. "[T]he determination of whether a claim has been properly preserved will depend on a careful review of the record to ascertain whether the claim on appeal was articulated below with sufficient clarity to place the trial court on reasonable notice of that very same claim." (Internal quotation marks omitted.) *State* v. *Best*, 337 Conn. 312, 317 n.1, 253 A.3d 458 (2020). A claim need only be "functionally preserved" to warrant appellate review, meaning that a party need not "use the term of art applicable to the claim, or cite to a particular statutory provision or rule of practice" but, instead, need only argue "the underlying principles or rules at the trial court level . . . ." (Internal quotation marks omitted.) Id.

In the present case, the plaintiff's operative complaint and his arguments to the trial court in his objection to the defendant's motion for summary judgment feature the photograph related allegations as a crucial aspect of his defamation claim and alerted the court that the photograph and its caption communicate to the reader malicious, harmful, and demonstrably false information unrelated to the official proceeding that is the subject of the news article. See part III A and B 1 of this opinion. That is enough to preserve the issue. To the extent that the photograph was not highlighted by the plaintiff as "independently" defamatory, the fault lies squarely with the defendant—the moving party—which chose to omit any reference to the photograph in its summary judgment papers identifying the allegations of defamation. Part II of the majority opinion. The plaintiff should not be prejudiced on appeal because he focused his opposition to summary judgment in the trial court on

Idlibi *v.* Hartford Courant Co.

the particular claims raised by the moving party. Under these circumstances, the plaintiff's claim of defamation relating to the photograph was preserved in the trial court, and the Appellate Court erred in failing to address it.

The legal sufficiency of the plaintiff's claim of defamation based on the photograph properly is before this court, and I now turn to the majority's analysis of the merits of that claim.[16] The majority's analysis is flawed in two respects.

1

First, although the majority acknowledges that self-represented parties should be shown solicitude and given "some latitude" under the rules "to ensure that [they] receive a full and fair opportunity to be heard, regardless of their lack of legal education and experience," I detect no effort on the part of the majority to give meaning to those principles or to apply them to the facts of this case. (Internal quotation marks omitted.) Part II A of the majority opinion. Instead, in legalistic fashion, the majority holds the plaintiff strictly to the conclusory terms that he uses to describe the legal importance of his allegations about the photograph.

---

[16] The majority, at times, conflates the legal standard for analyzing the preservation of the plaintiff's claim with the standard governing the merits of that claim, holding that the plaintiff's "vague and passing reference[s]" to the photograph were "insufficient to distinctly raise a claim [of defamation], even by a self-represented party," and, therefore, the trial court properly granted the defendant's motion for summary judgment. Part II B of the majority opinion. The standards governing these two different issues (i.e., the preservation of a claim for appellate review and the legal sufficiency of a cause of action) are separate and distinct. Compare *Fadner* v. *Commissioner of Revenue Services*, 281 Conn. 719, 729 n.12, 917 A.2d 540 (2007) (discussing claims that were either "distinctly raised" or "functionally" preserved at trial), with *Williams* v. *Housing Authority*, 327 Conn. 338, 372, 174 A.3d 137 (2017) (discussing modern pleading practice and trial courts' duty to construe pleadings "broadly and realistically, rather than narrowly and technically" (internal quotation marks omitted)).

Idlibi *v.* Hartford Courant Co.

The majority focuses on the fact that the plaintiff characterized the allegations as evidence of malice rather than as independently defamatory; the plaintiff argued that publication of the photograph demonstrated ill intentions, bad faith and an intent to incite public anger against him but—until oral argument—never explicitly described the photographs as communicating a falsehood. "There is no suggestion in the complaint or the plaintiff's affidavits . . . that the photograph was intended to or did present a false depiction of the plaintiff's own dental procedures." Part II B of the majority opinion. Likewise, the plaintiff never labelled the photograph itself as defamatory.[17]

The majority's analysis is inconsistent with our case law requiring courts to construe pleadings filed by self-represented parties with solicitude. Indeed, self-represented parties are entitled to a double dose of liberality in this regard. To begin with, all litigants, self-repre-

_____

[17] I find it significant that the majority concedes that two of the three elements of defamation (publication and harm) "plausibly" had been alleged with respect to the photograph but asserts that the plaintiff never alleged that this particular communication was false. Part II B of the majority opinion. This concession requires the majority to explain why the missing allegation of falsity, even if not necessarily implied in the complaint itself, is not amply supplied in the summary judgment context by the plaintiff's statements during oral argument before the trial court, quoted in the text of this opinion following this footnote, in which he explains that the procedure depicted in the photograph is unrelated to the department proceedings and that he had never performed that procedure. In response, the majority explains that the plaintiff's statements are not "admissible evidence" that can be used to oppose summary judgment. Id. The majority overlooks the fact that the person making the statement in court was *the plaintiff himself*, and his testimony about the falsity of the photograph obviously would be admissible at trial. The fact that he did not make the statement in affidavit form, if that is the majority's concern, is precisely the kind of curable technicality that should not be allowed to prevent a court from doing justice. See, e.g., *Flynn* v. *Dixon*, Docket No. FST-CV-22-5027234-S, 2023 WL 2495608, *1 (Conn. Super. March 8, 2023) (continuing hearing to allow parties, including self-represented plaintiff, to present evidence in form of "affidavit, exhibits, and/or testimony" after they relied solely on argument during previous hearing).

Idlibi *v.* Hartford Courant Co.

sented or not, are entitled to have their pleadings construed broadly for purposes of evaluating the legal sufficiency thereof. See, e.g., *Giacalone* v. *Housing Authority*, 306 Conn. 399, 403–404, 51 A.3d 352 (2012) ("We take [as true] the facts . . . alleged in the complaint . . . and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . [I]f facts provable in the complaint would support a cause of action, [a] motion to strike must be denied. . . . [M]oreover, we read the allegations broadly . . . rather than narrowly." (Internal quotation marks omitted.)).[18]

This requirement of liberal construction must be implemented with maximal solicitude when, as here, the court is construing the pleadings of a self-represented party. "[I]t is the established policy of the Connecticut courts to be solicitous of [self-represented] litigants and when it does not interfere with the rights of other parties to construe the rules of practice liberally in favor of the [self-represented] party. . . . Although the right of self-representation provides no attendant license not to comply with relevant rules of procedural and substantive law . . . we, nevertheless, give great latitude to [self-represented] litigants in order that justice may both be done and be seen to be done." (Citations omitted; internal quotation marks omitted.) *State* v. *Mark T.*, supra, 339 Conn. 232–33. "This court consistently

_____

[18] This standard, applicable to the legal sufficiency of a complaint in the context of a motion to strike, applies in the present context because the issue under consideration boils down to whether the plaintiff's allegations relating to the photograph state a legally sufficient "independent" claim of defamation, in the majority's words. Part II of the majority opinion. Although the trial court addressed the plaintiff's defamation claims in connection with the written statements, it did not reach the plaintiff's defamation claim in connection with the photograph. Instead, the court remained silent on the matter, implicitly throwing out the claim wholesale to the same effect as granting a motion to strike. The issue, then, is whether the defamation claim as to the photograph was sufficiently pleaded such that the court should have adjudicated it.

Idlibi *v.* Hartford Courant Co.

has been solicitous of the rights of [self-represented] litigants. . . . 'In such a situation not only this court, but our . . . trial court[s], so far as they properly can, will endeavor to see that such a . . . [litigant] shall have the opportunity to have his case fully and fairly heard, and will endeavor to aid a result . . . brought about by . . . [his] lack of legal education and experience, rather than to deny him an opportunity to be heard through a too strict construction of a rule of practice, when this course does not interfere with the just rights of the . . . [other party] . . . .' '' (Citations omitted.) *Connecticut Light & Power Co.* v. *Kluczinsky*, 171 Conn. 516, 519–20, 370 A.2d 1306 (1976), quoting *Higgins* v. *Hartford County Bar Assn.*, 109 Conn. 690, 692, 145 A. 20 (1929).

In accordance with these well established principles, the trial court should have construed the plaintiff's complaint to allege a claim of defamation based on the photograph. The record establishes plainly and convincingly that the plaintiff (1) contended that the photograph was false and defamatory, and (2) easily could have included an explicit allegation of falsity and attached a label designating the communication defamatory in his complaint if he had been told that it was obligatory to do so. It is clear from the allegations in the complaint and the plaintiff's elaboration at oral argument that his failure to allege in express terms that the photograph communicated a falsehood was the result of a misunderstanding on his part attributable to the mistaken (but understandable) belief that his allegation of malice subsumes and is predicated on a claim of falsity. I understand his intended meaning to be that the photograph is so abjectly misleading that the magnitude of the falsehood demonstrates a malicious intention. The plaintiff made it crystal clear during the course of the summary judgment proceedings that the photograph evidenced malice *because* it communicated the defamatory false-

hood that the procedure depicted in the photograph was the subject of the disciplinary hearing against him. He argued in the trial court that the photograph depicting "all those long, big screws sticking out of the child's mouth" had nothing to do with the allegations against him. He told the court that pediatric dentists "don't even do this [procedure] on children, with these kind[s] of implements sticking out of the mouth of a child . . . . I've never done this before. It's unheard of." He asked, rhetorically, "[w]hy would somebody publish such a big, graphic picture of this child with . . . screws [sticking] out of his mouth? What's the point? That's not even related to [the crown procedure that was the subject of the department allegations]." His argument, in summary, was predicated on the claim that the photograph communicated a damaging falsehood. This point was anything but "vague," "fleeting," or "passing"; part II B of the majority opinion; as the majority suggests— it was emphatic and unequivocal.

Perhaps because the falsity of the photograph was so obvious to him, or perhaps because he was confused by the defendant's omission of the photograph from its summary judgment argument, or perhaps because he did not understand that, legally speaking, an allegation of malice is distinct from an allegation of defamation, or perhaps because he was overly focused on defeating the public reporting privilege, or perhaps for all of these reasons, the plaintiff never expressly alleged, in so many words, that the photograph was itself a false and defamatory communication. But it is not possible to miss his meaning when we construe the complaint liberally, as we must, and it is not fair to characterize the plaintiff's references to the photograph and its wrongful nature as "vague," "fleeting" or "passing . . . ." Id. To the contrary, the allegations are factually specific and occupy most of one paragraph and all of another. It was the defen-

Idlibi *v.* Hartford Courant Co.

dant, not the plaintiff, who minimized the importance of these allegations by proceeding as if they did not exist.

Connecticut appellate courts have often applied the principles of liberal construction to conclude that comparably imperfect allegations nevertheless state a legally sufficient claim. See, e.g., *Escobar-Santana* v. *State*, 347 Conn. 601, 625–28, 298 A.3d 1222 (2023) (applying liberal rule of construction to interpret, as medical malpractice claim, count of complaint that had been pleaded as bystander emotional distress claim); *Doe* v. *Cochran*, 332 Conn. 325, 330, 336, 210 A.3d 469 (2019) (applying principle of liberal construction to conclude that plaintiff's "allegations reasonably can be understood to sound in ordinary negligence," despite defendant's contention "that the plaintiff's one count complaint sounds in medical malpractice"); *Presidential Village, LLC* v. *Phillips*, 325 Conn. 394, 412–13 n.15, 158 A.3d 772 (2017) (applying principle of liberal construction to interpret self-represented party's special defense as raising claim of equitable nonforfeiture); *Briere* v. *Greater Hartford Orthopedic Group, P.C.*, 325 Conn. 198, 213–14, 157 A.3d 70 (2017) (construing plaintiff's original complaint and concluding "that the plaintiff's cause of action [was the negligent performance of a] spinal surgery on the plaintiff," even though focus of original complaint was "on [the] improper use of [a] skull clamp," because, "read as a whole [the complaint] include[d] more general allegations that [the defendant surgeon had] failed to properly perform the surgery" and because "the plaintiff adequately put the defendants on notice that his claim related to [the defendant surgeon's] conduct during the surgery"); *Rockwell* v. *Quintner*, 96 Conn. App. 221, 232–33, 899 A.2d 738 (construing self-represented plaintiff's complaint broadly as "not foreclos[ing] the possibility that some of the plaintiff's alleged injuries stemmed from [a 2002] treatment" and, therefore, "as encompassing allegations of negligent treatment [not only in

Idlibi *v.* Hartford Courant Co.

2000], but also thereafter,'' including in 2002), cert. denied, 280 Conn. 917, 908 A.2d 538 (2006); *Vanguard Engineering, Inc.* v. *Anderson*, 83 Conn. App. 62, 65–66, 848 A.2d 545 (2004) (applying liberal rule of construction to interpret self-represented defendant's answer, although "not artfully pleaded," as "adequately set[ting] forth both a general denial and a claim for setoff"). The same approach should have been taken in the present case.

The majority incorrectly suggests that a liberal construction of the plaintiff's complaint to include a claim of defamation on the basis of the photograph would not be a reasonable accommodation under rule 2.2 of Connecticut's Code of Judicial Conduct, the commentary to which provides that it is not a violation of a judge's duty of fairness and impartiality "to make reasonable accommodations to ensure self-represented litigants the opportunity to have their matters fairly heard." Code of Judicial Conduct Rule 2.2, comment (4); see part II D of the majority opinion. The history and purpose of the commentary demonstrate otherwise. The commentary to our rules was adopted in conformance with a 2007 amendment to rule 2.2 of the American Bar Association's Model Code of Judicial Conduct. See Model Code of Judicial Conduct Rule 2.2, comment (4) (A.B.A. 2007). The amendment was enacted in response to a call "to create special rules enabling judges to assist [self-represented] litigants" and was intended to make "clear that judges do not compromise their impartiality when they make reasonable accommodations to [self-represented] litigants who may be completely unfamiliar with the legal system and the litigation process. To the contrary, by leveling the playing field, such judges ensure that [self-represented] litigants receive the fair hearing to which they are entitled." See id., Appendix B (reporter's explanation of comments to rule 2.2).

Idlibi *v.* Hartford Courant Co.

Although the term "reasonable accommodations" is not defined in our Code of Judicial Conduct, other states have provided the following useful examples: "(1) making referrals to any resources available to assist the litigant in the preparation of the case; (2) liberally construing pleadings to facilitate consideration of the issues raised; (3) providing general information about proceeding and foundational requirements; (4) attempting to make legal concepts understandable by using plain language whenever possible; (5) asking neutral questions to elicit or clarify information; [6] modifying the traditional order of taking evidence; and [7] explaining the basis for a ruling." Ark. Code of Judicial Conduct Rule 2.2, comment (4); see also Iowa Code of Judicial Conduct Rule 51:2.2, comment (4); Mass. Code of Judicial Conduct Rule 2.6, comment (1A); L. Rulli & L. Rieser, "Assuring Access to Pro Se Litigants in the Courtroom," 84 Philadelphia Law., No. 4, Winter, 2022, pp. 25–26; footnote 21 of this opinion.

Particularly in the context of construing pleadings, it is essential that courts accommodate self-represented litigants by examining whether there are sufficient facts alleged to support a viable legal theory, even if that legal theory is not identified with exactitude and specificity. As the United States Court of Appeals for the Second Circuit has observed, self-represented litigants "cannot be expected to know all of the legal theories on which they might ultimately recover. It is enough that they allege that they were injured, and that their allegations can conceivably give rise to a viable claim . . . . [A trial court's construction of a complaint] should be limited only by [the plaintiff's] factual allegations, not by the legal claims set out in his pleadings." (Citations omitted.) *Phillips* v. *Girdich*, 408 F.3d 124, 130 (2d Cir. 2005); see also *Stone* v. *Harry*, 364 F.3d 912, 915 (8th Cir. 2004) ("[w]hen we say that a pro se complaint should be given liberal construction, we

mean that if the essence of an allegation is discernible, even though it is not pleaded with legal nicety, then the [trial] court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework''); *Hall* v. *Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (court's solicitude toward self-represented litigants ''means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements'').

I note that federal courts operate under rules of judicial conduct no less rigorous than our own, yet those courts consider themselves free to demonstrate solicitude for self-represented parties by ''ignor[ing] the legal label that a [self-represented] litigant attaches'' to a claim and recharacterizing it ''to avoid an unnecessary dismissal . . . to avoid inappropriately stringent application of formal labeling requirements . . . or to create a better correspondence between the substance of [the self-represented party's] claim and its underlying legal basis . . . .'' (Citations omitted.) *Castro* v. *United States*, 540 U.S. 375, 381–82, 124 S. Ct. 786, 157 L. Ed. 2d 778 (2003); see also *Haines* v. *Kerner*, 404 U.S. 519, 520–21, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972) (self-represented plaintiff's complaint is held ''to less stringent standards than formal pleadings drafted by lawyers'' and should not be dismissed unless ''it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief'' (internal quotation marks omitted)). There is no reason that our state courts should be any less willing to accommodate self-represented litigants.

Even if it is asking too much of the trial court to construe the operative complaint to state an indepen-

Idlibi *v.* Hartford Courant Co.

dent claim of defamation based on the photograph related allegations, there is no doubt in my mind that the plaintiff should have been provided the opportunity to file an amended complaint to allege that claim once the pleading defect was identified. The plaintiff expressly requested that opportunity, in writing, in his objection to the defendant's motion for summary judgment, which provides in relevant part: "The plaintiff objects to the court's deciding the case through summary judgment on the basis of legal insufficiency or on the basis of inability to state a cause of action as to any of the plaintiff's claims. The plaintiff respectfully requests the court to [treat] the [defendant's] motion [for summary judgment] as a motion to strike if the court finds that any of the plaintiff's pleadings are legally insufficient. On the authority of *American Progressive Life & Health Ins. Co. of New York* v. *Better Benefits, LLC*, 292 Conn. 111, 124, 971 A.2d 17 (2009), and *Streifel* v. *Bulkley*, 195 Conn. App. 294, 302, 224 A.3d 539, cert. denied, 335 Conn. 911, 228 A.3d 375 (2020), the plaintiff maintains that his pleadings are legally sufficient but would offer to amend his pleadings if the court concludes otherwise." This request appears to have been ignored.[19]

The majority's analysis is fundamentally based on the premise that, although the trial court should show latitude when dealing with a self-represented party, that permissive approach must not exceed any strict limitations established by our rules of practice. This insistence on obedience to the fixed constraints of our rules sounds reasonable, until we see that permitting the plaintiff to file an amended complaint would have been entirely consistent with the rules of practice. The majority fails to confront the simple fact that it is normal and

---

[19] The majority states that "the plaintiff never filed any motion or made any request to revise or replead," and, therefore, "[t]he trial court never denied any such motion or request." Part II D of the majority opinion. This is not accurate. See footnote 1 of this opinion.

routine—and, in certain contexts, mandatory—to allow a plaintiff to amend his complaint in the early stages of a case. The rules of pleading provide that the trial court has the authority to permit a party to file an amended pleading "*at any time*" during the proceedings. (Emphasis added.) Practice Book § 10-60 (a). More specific to this case, the rules also provide that a party can file a substituted complaint *as of right* within fifteen days after the granting of a motion to strike. See Practice Book § 10-44. That same right applies in summary judgment proceedings, as well. In *American Progressive Life & Health Ins. Co. of New York* v. *Better Benefits, LLC*, supra, 292 Conn. 111, we reversed the trial court's decision to grant the plaintiff's motion for summary judgment challenging the sufficiency of the defendants' counterclaim, holding that the defendants were entitled to have the motion for summary judgment treated as a motion to strike when they had offered to amend their counterclaim to correct certain factual insufficiencies raised by the plaintiff and those insufficiencies reasonably were amenable to correction by repleading. See id., 114, 121–25; see also *Barash* v. *Lembo*, 348 Conn. 264, 297, 303 A.3d 577 (2023); *Larobina* v. *McDonald*, 274 Conn. 394, 400–403, 876 A.2d 522 (2005). Particularly considering our policy requiring that our courts "endeavor to see that [a self-represented litigant] shall have the opportunity to have his case fully and fairly heard, and . . . endeavor to aid a result . . . brought about by [the litigant's] lack of legal education and experience," the trial court should have given him the opportunity to file an amended complaint to set forth a claim of defamation based on the photograph related allegations. *Higgins* v. *Hartford County Bar Assn.*, supra, 109 Conn. 692.

For these reasons, I am persuaded that the complaint, as pleaded, alleges a claim of defamation based on the defendant's publication of the photograph under the

Idlibi *v.* Hartford Courant Co.

circumstances of this case. Even if the trial court did properly decide not to construe the complaint in that manner, the court was obligated under the circumstances to provide the plaintiff with an opportunity to amend his pleadings in light of his offer to do just that. The defendant's motion for summary judgment therefore was improperly granted.

2

I also strongly disagree with the majority that it would prejudice the defendant to permit the plaintiff to proceed with his claim of defamation based on the photograph. The majority expresses concern that the trial court would depart from its role as neutral arbiter if the court allowed the plaintiff to amend his complaint to cure the putative deficiency. See part II D of the majority opinion. It emphasizes the rising costs of business that require newspapers to rely on stock images, the important first amendment rights at stake, and the powerful interest that newspapers have in avoiding the costs of frivolous lawsuits. See part II B of the majority opinion.

I disagree across the board. First of all, it shows no favoritism when a court allows a party an opportunity to cure a previously unnoticed pleading deficiency. To the contrary, as I discussed in part III B 1 of this opinion, our rules actually *require* that a party be given that opportunity. See Practice Book § 10-44 (permitting party to file new pleading within fifteen days after granting of motion to strike). More generally, the rules give the trial court discretion to permit amendments at any time, including during trial, after trial, and even after judgment is rendered. See Practice Book § 10-60 (a) (1) (trial court is authorized to permit parties to amend pleadings "at any time"); Practice Book § 10-62 (authorizing amendment of pleadings "at any stage of the trial" to conform differences in allegations and proof); see,

Idlibi *v.* Hartford Courant Co.

e.g., *Independent Party of CT—State Central* v. *Merrill*, 330 Conn. 681, 727–29, 200 A.3d 1118 (2019) (holding that trial court did not abuse its discretion by allowing defendants to amend pleading after close of evidence); *Intercity Development, LLC* v. *Andrade*, 286 Conn. 177, 190, 942 A.2d 1028 (2008) (noting liberal policy with respect to amendment of pleadings and stating that, when "a legitimate cause of action is available, but not raised in the original complaint, and allowing such claim in the proceedings will not unduly prejudice the opposing party, then allowing the amendment is not an abuse of the court's discretion" (internal quotation marks omitted)); *Ideal Financing Assn.* v. *LaBonte*, 120 Conn. 190, 195–96, 180 A. 300 (1935) (it was error not to allow defendants to amend their answer two days after judgment); cf. *Foman* v. *Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962) ("If the underlying facts or circumstances relied [on] by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment"—leave to amend complaint should "be freely given." (Internal quotation marks omitted.)).

The trial court, moreover, is not required by the rules to remain a passive observer with respect to the need or advisability of amendments to the pleadings. Practice Book § 10-1, which establishes the fundamental precept of fact pleading, makes it clear that the trial court possesses the authority, sua sponte, to require parties to clarify the pleadings to better define the issues in dispute: "If any such pleading does not fully disclose the ground of claim or defense, the judicial authority may order a fuller and more particular statement; and, if in

Idlibi *v.* Hartford Courant Co.

the opinion of the judicial authority the pleadings do not sufficiently define the issues in dispute, it may direct the parties to prepare other issues, and such issues shall, if the parties differ, be settled by the judicial authority.'' Likewise, the trial court may require a party to amend its pleadings at any time, without awaiting a motion or other prompting by the parties. See Practice Book § 10-60 (a) (1); Practice Book § 10-62; see also *Crowell* v. *Middletown Savings Bank*, 122 Conn. 362, 370, 189 A. 172 (1937) ("The court may permit . . . an amendment [to a pleading] at any stage of the trial . . . [the court] may suggest or even direct it, under proper circumstances, and its action is discretionary . . . and can be reviewed only when this discretion is abused. . . . It was well within the discretion of the trial court to suggest the amendment and to permit it to be filed.'' (Citations omitted.)).

The trial court would not have shown favoritism to the self-represented plaintiff if it had permitted him to amend his complaint, at the pretrial stage, to cure the pleading deficiency relating to the photograph. Nor would that procedure have prejudiced the defendant, which certainly had no right to proceed to judgment without the plaintiff being given an opportunity to replead. This was not a plaintiff who had already been provided such opportunities or who had already taken numerous bites at the apple. To the contrary, the defendant moved for summary judgment immediately on the original complaint, and the plaintiff was *never* given an opportunity to amend his complaint upon learning that the allegations regarding the photographs were insufficiently pleaded; he was never even given prior notice that his claim based on the photograph failed to state an independent claim of defamation. Legitimate concerns about favoritism and prejudice are not implicated on these facts.

Idlibi *v.* Hartford Courant Co.

There is nothing at all improper with a trial court's telling a litigant, self-represented or not, exactly what makes a pleading insufficient. This is what courts do and are supposed to do: explain to the parties why they have won or lost. See Practice Book § 6-1 (a) (6) ("The judicial authority shall state its decision either orally or in writing . . . in making any . . . rulings that constitute a final judgment for purposes of appeal under General Statutes § 52-263, including those that do not terminate the proceedings. The judicial authority's decision shall encompass its conclusion as to each claim of law raised by the parties and the factual basis therefor."). Trial and appellate courts often explain their reasoning in exquisite detail, as the majority itself has done by issuing a decision explicating what it considers the precise defects in the plaintiff's pleading. No one is suggesting that the trial court should have drafted the amended complaint for the plaintiff or advised him in a partisan manner. The majority's concerns about neutrality, although valid in the abstract, have no application to the facts of this case.[20]

[20] The fact that the plaintiff is self-represented, of course, made it all the more important for the trial court to explain its rulings and the legal principles underlying those rulings. Doing so is usually necessary if a court wants to successfully manage a case involving one or more self-represented parties, and there is nothing inappropriate about providing detailed explanations of legal rules and rulings to the litigant, as long as it is done in a fair and neutral manner. See, e.g., *McGuire* v. *McGuire*, 102 Conn. App. 79, 82, 85, 924 A.2d 886 (2007) (considering plaintiff's claim "that the [trial] court [had become] an advocate for the [self-represented] defendant and [had] entered an order that clearly demonstrated its bias in favor of the defendant and against [the plaintiff]," and concluding that "the court's questioning of various witnesses to elicit testimony favorable to the defendant" and "the court's interruptions of the plaintiff's counsel when he attempted to make objections during the course of the hearing" did "not reveal any bias against the plaintiff or for the defendant"); *Emerick* v. *Kuhn*, 52 Conn. App. 724, 761, 762, 763, 737 A.2d 456 (reviewing conduct of trial court—which "took pains to explain to the [self-represented] plaintiff that . . . the defendants were entitled to cross-examine him," "carefully explained to the plaintiff why it could not guarantee that the defendants would not be able to present [certain] evidence," and "asked the presiding judge to speak with the plaintiff to explain . . . the benefit of withdrawing [certain] claims"—and concluding that,

Idlibi *v.* Hartford Courant Co.

The line sometimes can be hard to draw between appropriate and inappropriate judicial guidance to a lawyer or litigant. As it relates to self-represented parties, the general topic is too broad to address in this opinion.[21] But the line is easy to draw in this case. No impropriety would occur—not even close—if the trial court were to explain to the plaintiff why the allegations relating to the photograph, as drafted, fail to state a claim of defamation and to provide him a short amount of time to file an amended complaint curing the deficiency.

We must not lose sight of the goal, which is to avoid allowing technicalities to prevent the parties from litigating the merits of a claim or defense. The United States Supreme Court affirmed this principle in *Krupski* v. *Costa Crociere S. p. A.*, 560 U.S. 538, 130 S. Ct. 2485, 177 L. Ed. 2d 48 (2010), explicitly adopting a construction of rule 15 (c) (1) (C) (ii) of the Federal Rules of Civil Procedure that balances the interests of defendants with the overarching preference "for resolving disputes on their merits." Id., 550. The same principle is very familiar to us in Connecticut, and this court repeatedly emphasizes its importance across a wide variety of contexts. In *Costello* v. *Goldstein & Peck, P.C.*, 321 Conn. 244, 137 A.3d 748 (2016), we stated: "[I]t is our expressed

rather than demonstrating bias, "the trial court was extraordinarily even-handed" and "appropriately took into account the [self-represented] status of the plaintiff"), cert. denied, 249 Conn. 929, 738 A.2d 653, cert. denied sub nom. *Emerick* v. *United Technologies Corp.*, 528 U.S. 1005, 120 S. Ct. 500, 145 L. Ed. 2d 386 (1999).

[21] See C. Gray, "Reaching Out or Overreaching: Judicial Ethics and Self-Represented Litigants," 27 J. National Assn. Admin. L. Judiciary 97, 162–68 (2007) (proposing best practices for trial courts to follow when presiding over cases involving self-represented litigants); see also J. Goldschmidt et al., American Judicature Society, Meeting the Challenge of Pro Se Litigation: A Report and Guidebook for Judges and Court Managers (1998) pp. 107–11 (offering detailed policy recommendations for judges and courts to better assist self-represented litigants); J. Goldschmidt, "How Are Courts Handling Pro Se Litigants?," 82 Judicature 13, 21 (1998) (similarly providing recommendations for judges and courts in assisting self-represented litigants).

policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court. . . . The design of the rules of practice is both to facilitate business and to advance justice; they will be interpreted liberally in any case [in which] it shall be manifest that a strict adherence to them will work surprise or injustice. . . . Our practice does not favor the termination of proceedings without a determination of the merits of the controversy [when] that can be brought about with due regard to necessary rules of procedure." (Internal quotation marks omitted.) Id., 254; see *Supronowicz* v. *Eaton*, 224 Conn. App. 66, 92, 312 A.3d 100 ("[s]o extreme a remedy as summary judgment should not be used as a substitute for trial or as a device intended to impose a difficult burden on the [nonmoving] party to save his [or her] day in court unless it is clear that no genuine issue of fact remains to be tried" (internal quotation marks omitted)), cert. denied, 349 Conn. 904, 312 A.3d 1057 (2024).

Nor can I agree with the majority's discussion concerning the financial difficulties faced by the newspaper industry, which are not properly part of our consideration with respect to the issue at hand. See part II B of the majority opinion. Nothing prevents newspapers from relying on stock photographs in their news stories. I hope we can all agree, however, that newspapers cannot use stock photographs that convey a defamatory meaning unprotected by any privilege. As with the words chosen by the reporter, appropriate care must be exercised by the publisher in selecting photographs to accompany the article so that a reasonable reader will not be misled about the material facts in a way that causes reputational harm to the subject of the story. The majority contends that, because the journalism industry depends on the use of stock photographs to save money, it would have been improper for the trial court to show solicitude to the plaintiff by allowing him

Idlibi *v.* Hartford Courant Co.

to expressly plead a claim of defamation based on the photograph. See id. To state the argument is to demonstrate why it cannot be maintained. I know of no privilege for distressed news organizations. The issue before us is whether the self-represented plaintiff alleged an independent claim of defamation based on the photograph or, alternatively, was improperly deprived of the opportunity to make that claim. The majority cannot be heard to argue that the answer to these questions is "no" because stock photographs are an important and cost-effective means of publishing the news.

Likewise with respect to the argument that an amended pleading should not have been permitted because the news industry "has a powerful interest in not having to defend frivolous defamation claims when it publishes on matters of public concern such as children's health and Medicaid fraud." Id. The word "frivolous" does all of the work in this sentence and reveals the circularity of the argument. No one has argued that a defamation claim regarding the photograph is or would be frivolous, or even meritless. Again, the issue is whether the claim has been made or should be permitted, not whether the claim would be meritorious. I address the majority's discussion of the merits of the defamation claim in part IV of this opinion.

Finally, the majority asserts that, "perhaps most significant," the plaintiff should not have been permitted to amend his complaint to allege a defamation claim based on the photograph because, by his own admission, his reputation was also damaged as a result of the past and current disciplinary proceeding, and his entitlement to anything more than nominal damages for harm attributable only to the photograph would have been difficult to prove. Part II B of the majority opinion. No case law or other authority is cited in support of this point, and I am unable to discern its legal basis. The issue of proving damages has not been raised or briefed

Idlibi *v.* Hartford Courant Co.

by the parties, or addressed by the trial court, and should not be the subject of this court's hypothetical concerns at this stage. In any event, the majority appears to acknowledge that the plaintiff, if successful, would be entitled to nominal damages as a matter of law. See id. This is so because a claim of libel per se entitles the prevailing plaintiff to an award of general damages without evidence of any pecuniary loss. See, e.g., *Chugh* v. *Kalra*, 342 Conn. 815, 850, 271 A.3d 993 (2022) (citing cases); see also *Lyons* v. *Nichols*, 63 Conn. App. 761, 769, 778 A.2d 246 ("[t]he plaintiff's inability to provide the court with a reasonable means of calculating the extent of the harm caused by the libelous statement does not bar the plaintiff from recovering otherwise valid awards of nominal and punitive damages"), cert. denied, 258 Conn. 906, 782 A.2d 1244 (2001); 3 Restatement (Second), Torts § 620, p. 317 (1977) ("[o]ne who is liable for a slander actionable per se or for a libel is liable for at least nominal damages"); 3 Restatement (Second), supra, § 620, comment (a), p. 317 ("[n]ominal damages are awarded when the insignificant character of the defamatory matter, or the plaintiff's bad character, leads the jury to believe that no substantial harm has been done to his reputation, and there is no proof that serious harm has resulted from the defendant's attack [on] the plaintiff's character and reputation").

Even if only nominal damages were available to the plaintiff—an issue that has never been raised or decided in this case—the award of nominal damages in a defamation case is meaningful. Nominal damages are considered to be "an award of a small sum of money to vindicate the plaintiff's good name." M. Pollack, "Litigating Defamation Claims," 128 Am. Jur. Trials 1, § 12 (Cum. Supp. 2024); see also S. Blanchard, "Nominal Damages as Vindication," 30 Geo. Mason L. Rev. 227, 233–39 (2022) (discussing historical and wide-ranging significance of nominal damages in "private law actions").

350 Conn. 557 NOVEMBER, 2024 625

Idlibi *v.* Hartford Courant Co.

Additionally, our courts have repeatedly held that the difficulties inherent in calculating damages should not prevent plaintiffs from recovery in defamation cases. See, e.g., *Lyons* v. *Nichols*, supra, 63 Conn. App. 769.

IV

The majority concludes that the plaintiff should not have been allowed to proceed on a claim of defamation based on the photograph because it would have been "a Herculean task"; part II B of the majority opinion; for the plaintiff to have prevailed on this "relatively novel claim . . . ." Part II D of the majority opinion. I cannot agree for numerous reasons.

First, neither party briefed the issue in this or any other court. The legal sufficiency of this particular claim of defamation was never addressed by the Appellate Court or the trial court because both courts assumed that the claim had not been made, and neither of them addressed whether the plaintiff should have been given the opportunity to amend his complaint to include such a claim. Perhaps for this reason, the majority's observations regarding the legal viability of this claim do not purport to decide whether the photograph related allegations, if properly pleaded, would state a legally sufficient defamation claim. The majority only opines that the plaintiff would face great difficulty succeeding. Even if the majority were correct, however, the plaintiff should be allowed the chance. The appropriate course would be to allow the plaintiff to amend his complaint on remand, and, if the defendant challenges the legal sufficiency of the claim, the trial court may adjudicate the issue under the correct legal standard.

Second, and relatedly, whether the photograph was defamatory is not an issue of law to be decided by this court on appeal. Settled legal principles establish that it is for a "jury [to determine] whether a communication, capable of a defamatory meaning, was so understood

by its recipient." 3 Restatement (Second), supra, § 614 (2), p. 311; see *NetScout Systems, Inc.* v. *Gartner, Inc.*, 334 Conn. 396, 417–18, 223 A.3d 37 (2020) (observing " 'the rule [that] requires the jury to decide whether an ambiguous assertion is reasonably capable of a defamatory meaning' "), quoting *Goodrich* v. *Waterbury Republican-American, Inc.*, 188 Conn. 107, 112 n.5, 448 A.2d 1317 (1982). It is also well settled that the misleading use of a stock photograph in a news article is capable of conveying a defamatory meaning. "A picture is worth a thousand words," explained the United States Court of Appeals for the Ninth Circuit. *Manzari* v. *Associated Newspapers Ltd.*, 830 F.3d 881, 883 (9th Cir. 2016). The photograph, moreover, takes on meaning from its surrounding context, and "the headline, caption and photograph taken together are also a statement" for purposes of defamation law. Id., 890.

As the majority points out, there is ample precedent holding that a reasonable person can infer a defamatory meaning from a stock photograph, headline, and caption that together convey the false idea that the plaintiff engaged in a particular wrongful or opprobrious act. See footnote 9 of the majority opinion (citing cases); see also *La Liberte* v. *Reid*, 966 F.3d 79, 92–93 (2d Cir. 2020) (dismissal of defamation claim "on the ground that it express[ed] nonactionable statements of opinion" was improper when "[a] reader could interpret the juxtaposition of [a] [p]hotograph [of the plaintiff] with [a] 1957 [photograph showing one of the Little Rock Nine walking past a screaming white woman] to mean that [the plaintiff] likewise screamed at a child out of racial animus" and "as an accusation of concrete, wrongful conduct" (internal quotation marks omitted)); *Manzari* v. *Associated Newspapers Ltd.*, supra, 830 F.3d 890–91 (plaintiff adult film actress alleged legally sufficient claim of defamation based on stock photograph, headline, and caption implying that plaintiff had

Idlibi *v.* Hartford Courant Co.

tested positive for human immunodeficiency virus); *Cheney* v. *Daily News L.P.*, 654 Fed. Appx. 578, 582 (3d Cir. 2016) (dismissal of defamation claim was improper when article discussing sex scandal included photograph of firefighter, who had no part in scandal, "next to the text of the article and underneath the headline introducing the scandal"); *Grimsley* v. *CBS Broadcasting, Inc.*, Docket No. 2:21-cv-4008-DCN, 2022 WL 719610, *2–3, *5 (D.S.C. March 10, 2022) (denying motion to dismiss when plaintiff plausibly alleged that article regarding firing of two police officers, accompanied by photograph of plaintiff and identifying him by name "above the headline of the article," constituted defamatory statements " 'of and concerning' " plaintiff); *Morrell* v. *Forbes, Inc.*, 603 F. Supp. 1305, 1307 (D. Mass. 1985) (denying motion for summary judgment when photograph of plaintiff fisherman was published alongside article addressing influence of organized crime in wholesale fish markets because photograph reasonably could be viewed either as stock photograph or as suggestion that plaintiff was "involved with organized crime," thereby preventing court from concluding that the "publication [could not] reasonably be construed to be defamatory in any sense").[22]

---

[22] The majority distinguishes these cases on the grounds that the photographs all depicted individuals who were not involved in the wrongdoing that was the subject of the accompanying news story, whereas the plaintiff in the present case was the individual who was the subject of the news story, and that it "would open a Pandora's box" to conclude that "a stock photograph depicting arguably worse, or at least different, bad conduct" than that committed by the defendant is defamatory. Part II D of the majority opinion. These contentions miss the mark for two reasons. First, the defamation claim at issue is that the plaintiff did not do what the communication (the photograph, caption and headline) implies he did, namely, perform the gruesome looking procedure on young patients. The fact that the photograph depicts the procedure rather than the plaintiff is not important; in both situations, the alleged defamation consists of a meaning that a reasonable person could infer from the publication. Second, it is not novel, anomalous, or unmanageable to conclude that a deceptive and misleading photograph may support a claim for defamation if all of the elements of the tort are met, regardless of whether that photograph depicts the plaintiff or someone

Idlibi *v.* Hartford Courant Co.

Whether a jury issue is presented in any particular case requires consideration of whether the plaintiff has "demonstrate[d] that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." (Internal quotation marks omitted.) *Gleason* v. *Smolinski*, 319 Conn. 394, 430, 125 A.3d 920 (2015), quoting *Gambardella* v. *Apple Health Care, Inc.*, 291 Conn. 620, 627–28, 969 A.2d 736 (2009); see 3 Restatement (Second), supra, § 613 (1), pp. 306–307 (providing more exhaustive enumeration).

The majority does not conduct that analysis. It predicts the *outcome* of that analysis based on its assessment that the plaintiff would face an uphill battle, but even that conclusory assessment is not conducted using the appropriate point of reference. The majority states that the plaintiff's task would be difficult because it would entail proving that "the procedure depicted in the photograph is significantly more disturbing than run-of-the-mill dental procedures ranging from fillings to root canals, all of which involve sticking foreign metal implements into the mouths of patients under bright lighting, often accompanied by pain and blood." Part II B of the majority opinion. The procedure at issue involved the installation of crowns on a child's teeth,

or something else. See, e.g., *Cepeda* v. *Cowles Magazines & Broadcasting, Inc.*, 328 F.2d 869, 870–71 (9th Cir.) (concluding that jury reasonably could find that magazine article and photograph showing plaintiff baseball player "being banned by the umpire from a game because he had made a violent gesture . . . at being called out at first base" was defamatory when it was disputed whether plaintiff was "temperamental, uncooperative and underproductive" (internal quotation marks omitted)), cert. denied, 379 U.S. 844, 85 S. Ct. 51, 13 L. Ed. 2d 50 (1964); see also *John's 53-26, Inc.* v. *Chilton Co.*, 83 App. Div. 2d 830, 831, 441 N.Y.S. 2d 556 (1981) (whether photograph of plaintiff's gas station and accompanying caption were defamatory was "for the jury to decide").

350 Conn. 557      NOVEMBER, 2024            629
Idlibi *v.* Hartford Courant Co.

not the other procedures mentioned by the majority.
Without a more robust record, none of us knows whether
a jury would conclude that a reasonable person could
view allegations of unnecessary crown procedures as
a significantly less serious wrongdoing than similar alle-
gations involving the procedure depicted in the photo-
graph. Perhaps not, but we are in no position to decide
that question at this stage of the proceedings.

V

The trial court had ample reason to believe that the
plaintiff was attempting to make a claim of defamation
on the basis of the allegations regarding the photograph.
See part III B 1 of this opinion. No rule of practice or
consideration of fairness barred the trial court from
construing the complaint as making such a claim. Like-
wise, no rule or principle of fairness prevented the court,
alternatively, from (1) explaining to the self-represented
plaintiff, in plain and understandable terms, the specific
pleading deficiency that prevented the court from treat-
ing the photograph related allegations as stating a claim
of defamation, and (2) providing a reasonable period
of time within which to file an amended complaint to
cure the deficiency; indeed, the trial court was required
to do so. See part III B 2 of this opinion.

None of these actions would have required the trial
court to demonstrate any favoritism toward the plaintiff
or encroached on any right held by the defendant. See
part III B 1 and 2 of this opinion. The defendant has
no right under our laws to obtain judgment on nonjuris-
dictional grounds, at the pretrial stage of litigation, based
on the trial court's strict construction of the complaint.
The defendant also has no legal right to obtain judgment
on nonjurisdictional grounds, at the pretrial stage of
litigation, without the opposing party being given an
opportuinity to file an amended complaint to cure a
pleading deficiency. The defendant may have a strong
case on the merits, operate in an industry vital to our

Idlibi *v.* Hartford Courant Co.

constitutional rights, and face rising costs that could be mitigated by a positive outcome in the lawsuit. But, unless it is immune from suit, it cannot claim that its rights are violated by a judicial order allowing the plaintiff to plead a cause of action that the defendant can then challenge on the merits.

Taking the simple measures described in this opinion would have advanced the commitment made by the judiciary of this state to demonstrate solicitude to self-represented litigants for the purpose of ensuring that our system of justice works for everyone and treats all litigants with fairness. Almost one hundred years ago, this court assured the public that our judiciary "will endeavor to see that . . . a [self-represented] plaintiff shall have the opportunity to have his case fully and fairly heard" and take any proper steps to reach the merits of a case, rather than throw it out on a procedural technicality stemming from a litigant's "lack of legal education and experience . . . ." *Higgins* v. *Hartford County Bar Assn.*, supra, 109 Conn. 692. The term "proper" in the preceding sentence is an important one, and, no doubt, this principle will not always save a self-represented party from the fatal consequences of an act or omission occurring in the pretrial stages of litigation. Each case will be decided on its own particular circumstances, which must include any legitimate claim of prejudice to the opposing party. In the present case, I am convinced that the trial court was obligated, at the very least, to give the plaintiff leave to file an amended complaint to cure any pleading deficiencies.

I make one final observation. Although the majority and I disagree about the proper disposition of this case, it appears that we agree in principle that trial courts can and should show solicitude to self-represented litigants, to the extent permitted under our rules of practice, so that their claims are not lost at the pretrial stage as the result of pleading defects and other technical deficiencies that can be corrected without undue preju-

Idlibi *v.* Hartford Courant Co.

dice to any party. I am hopeful that the Judicial Branch will develop practical guidelines and instructional materials to better educate both trial and appellate court judges about specific procedures and protocols that will help us implement this principle in practice. If our courts are inaccessible to self-represented litigants with meritorious claims, then the public will lose faith in our ability to provide equal justice to all members of society. This sense of estrangement arises in part when lawsuits proceed in accordance with arcane rules and when the business of the courts is conducted using a specialized language that is often impenetrable to those outside of the profession. We can change this trajectory only if we develop ways to make good on our promise of showing solicitude to all self-represented litigants who come to our courts, whether by choice or financial necessity. In my opinion, this case presented us with an ideal occasion to begin that work, and I consider it unfortunate that we did not seize the opportunity. I hope we correct course when next given the chance, and, in the meantime, I urge trial courts to exercise their discretion to treat self-represented litigants with solicitude to the extent permitted by the rules of practice and as appropriate in the particular circumstances of the case.

I respectfully dissent.

632          NOVEMBER, 2024          350 Conn. 633

Idlibi *v.* Hartford Courant Co.

<u>APPENDIX</u>



A Terryville dentist, Ammar Idlibi, is being investigated by the state Department of Public Health for doing unnecessary and medically unsound work on children